[No. C033929. Third Dist. July 30, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
SUZANNA SAVEDRA YOUNGBLOOD, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, V, VI, VII, and VIII.

**COUNSEL**

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell and Jean M. Marinovich, Deputy Attorneys General, for Plaintiff and Appellant.

**OPINION**

**NICHOLSON, J.**—The defendant accumulated 92 cats and kept them in a 7½-foot by 11-foot trailer, providing less than one square foot for each cat. Convicted by jury of felony animal cruelty and placed on probation, she appeals. She asserts the trial was tainted by instructional error, due process violations, and evidence that should have been suppressed. We affirm.

### PROCEDURE

The defendant was charged by information with seven counts of animal cruelty in violation of Penal Code section 597, subdivision (b). Count 1 alleged cruelty to all 92 of the cats, while counts two through seven alleged cruelty to one specified cat each. The jury found the defendant guilty of count 1 but not guilty of counts two through seven. The court placed the defendant on five years of formal probation with a condition that she serve 92 days in county jail. The court also ordered her not to possess or care for any cat or dog, except for a cat named Holly Angel.

### FACTS

On December 31, 1998, Officer Robert Carter of Placer County Animal Control responded to a complaint that an excessive number of cats were being kept under poor health and living conditions in a small trailer. Officer

Carter went to the property and saw a residence with a small trailer near the garage. He smelled a strong odor of ammonia, which he associated with animal urine, when he left his truck and started toward the residence. Terrance Deveany, the owner of the property, responded when Officer Carter knocked on the door. Deveany told Officer Carter the trailer belonged to the defendant.

Officer Carter approached the trailer and looked inside through the windows. He saw at least 35 cats in the trailer. At various places in the trailer, he saw fecal matter and urine. Many of the cats were sneezing and had eye discharge. Officer Carter telephoned the on-call magistrate and obtained a search warrant for the trailer. The officer then called for a tow truck. As they were hooking up the trailer to the tow truck, the defendant arrived at the property. She stated she was taking care of the cats and believed there were between 80 and 90 in the trailer. She tried to give Officer Carter a vial with medicine for the cats, but he would not accept it because it was not adequately marked. The trailer was towed to the DeWitt Center so it could be placed in a building before being opened to prevent loss of control of the cats.

When the trailer was first opened at the DeWitt Center, Officer Carter entered with a video camera and recorded the conditions inside the trailer. The videotape was played for the jury.

The cats, 92 in all, were removed from the trailer and assigned numbers for identification. Most of the cats appeared unhealthy. They were examined and treated by a veterinarian. Her initial summary of the condition of the cats is as follows: "Most of the cats were covered in urine and feces. There [were] many that were malnourished, emaciated. Cats were sick with upper respiratory, herpes virus. They had ear mites, fleas. There [were] cats with neurologic[al] problems. There [were] cats that were missing portions of their limbs or had deformed limbs. There [were] cats with urine scald, and there [were] cats that were either blind or partially blind in one or both eyes and cats that were missing eyes, too." The veterinarian also described other ailments suffered by the cats. Many of the problems described by the veterinarian, such as dehydration, chronic malnourishment, anorexia, urine scald, and severe infection, occur as a result of inadequate care over a long period.

The defendant testified. She lived in Sacramento County. In October 1998, she put the cats, about 35 to 40 at the time, in the trailer and moved them to the Deveany property in Placer County because Sacramento Animal Control officials told her she could not have more than four cats. She lived

with the cats at first, either in the trailer or in a tent next to the trailer, feeding the cats and cleaning up after them. She brought additional stray cats from the Sacramento County neighborhood to the trailer. Eventually, she moved back to Sacramento County and visited the trailer to care for the cats. During the last two weeks before animal control seized the trailer, the defendant was sick and did not visit the cats as often. She contended that the messy conditions inside the trailer were a result of the removal of the trailer to the DeWitt Center. She knew she had too many cats, but she asserted she was trying to save their lives.

DISCUSSION

I

*Instruction Concerning Elements of Animal Cruelty*

Concerning the charge of animal cruelty (Pen. Code, § 597, subd. (b)), the trial court instructed the jury as follows: "Every person who causes an animal to be deprived of necessary sustenance, drink or shelter or who having care or custody of an animal subjects the animal to needless suffering or fails to provide the animal with proper food, drink, [or] shelter in a criminally negligent manner is guilty of cruelty to an animal." And later: "In order to prove such a crime each of the following elements must be proved: One, that a person has custody or is responsible for providing care to an animal; two, that person either (a) deprived or caused an animal to be deprived of necessary sustenance, drink or shelter, or (b) subjected an animal to needless suffering in a criminally negligent manner, and (c) that act or omission caused danger to an animal's life." These instructions allowed the jury to find the defendant guilty of animal cruelty for committing either of the listed acts: (1) depriving the cats of necessary sustenance, drink, or shelter or (2) subjecting the cats to needless suffering.

The defendant asserts the trial court erred in instructing the jury concerning the elements of animal cruelty. She contends the trial court did not properly apply the use of the word "and" in the statute. We conclude the trial court correctly interpreted the statute.

Subdivision (b) of Penal Code section 597 provides: "Except as otherwise provided in subdivision (a) or (c), every person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived

of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; *and* whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for every such offense, guilty of a crime punishable as a misdemeanor or as a felony or alternatively punishable as a misdemeanor or a felony and by a fine of not more than twenty thousand dollars ($20,000)." (Italics and boldface added.)

The defendant asserts the boldface, italicized "and" in the middle of the long subdivision must be interpreted to require the prosecution, in order to obtain a conviction for animal cruelty, to prove the defendant committed one of the acts listed before the "and" as well as one of the acts listed after the "and." For example, if the prosecution established that the defendant deprived the cats of necessary sustenance, which is one of the acts listed before the "and," it would also have to establish that the defendant subjected the animal to needless suffering or committed one of the other acts listed after the "and" in order to obtain a conviction for violation of Penal Code section 597, subdivision (b). In support of her argument, the defendant states simply that the use of the conjunctive in a statute requires proof of both elements. She makes no effort, however, to further analyze the actual language of Penal Code section 597, subdivision (b). The defendant's argument fails when the grammatical structure of the long, complex subdivision is carefully considered.

In all material respects, the language in subdivision (b) of Penal Code section 597 was enacted in 1905. The part of the statute ("and whoever, . . .") upon which the defendant relies to support her argument remains the same from that early date. (See Stats. 1905, ch. 519 (DXIX) § 1, p. 679.)

The use of the word "whoever" is dispositive. "Whoever" means "whatever person," "any person at all that," or "no matter who." (Webster's 3d New Internat. Dict. (1969) p. 2611.) In the structure of this statute, "whoever" is a subject, as is the phrase "every person" at the beginning of the statute. If the Legislature had meant to require proof of an act listed before "and" and an act listed after "and," it would not have used a new subject. Instead, it would have used the word "who," which would have referred back to the subject ("every person") at the beginning of the sentence or it would have left that position in the sentence blank.

We must interpret a statute consistently with the meaning derived from its grammatical structure. (See *Horwich v. Superior Court* (1999) 21 Cal.4th

272, 280 [87 Cal.Rptr.2d 222, 980 P.2d 927].) By using the word "whoever" as a second subject in the sentence, the Legislature, effectively, listed two separate ways (each with a list of acts) to find a defendant guilty of animal cruelty. That the two lists are joined by the conjunctive "and" does not convey the meaning attributed to the statute by the defendant. Written in 1905, the statute may be said to include literary flair in the place of a bland numbered list, the likes of which we have come to expect and prefer in contemporary discourse. (See, e.g., Pen. Code, § 1192.7, subd. (c) [listing dozens of "serious felonies"].) We conclude the trial court interpreted the statute correctly and properly instructed the jury it could find the defendant guilty of animal cruelty for either (1) depriving the cats of necessary sustenance, drink, or shelter, or (2) subjecting the cats to needless suffering.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

### Instruction Concerning Defense of Necessity

■ The defendant requested an instruction on the defense of necessity.[1] She claimed that she was keeping the cats to save them from euthanasia at animal control. The trial court rejected the instruction and denied the defendant's request that she be permitted to present argument to the jury on the defense. On appeal, the defendant asserts the trial court erred. We conclude that, under the facts of this case, the defense of necessity was not available.

■ "The defense of necessity is 'founded upon public policy and provides a justification distinct from the elements required to prove the crime. [Citation.] The situation presented to the defendant must be of an emergency

---

*See footnote, *ante*, page 66.

[1]CALJIC No. 4.43 states:

"A person is not guilty of a crime when [he] [she] engages in an act, otherwise criminal, through necessity. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the elements of this defense, namely:

"1. The act charged as criminal was done to prevent a significant and imminent evil, namely, [a threat of bodily harm to oneself or another person] [or] . . . ;

"2. There was no reasonable legal alternative to the commission of the act;

"3. The reasonably foreseeable harm likely to be caused by the act was not disproportionate to the harm avoided;

"4. The defendant entertained a good-faith belief that [his] [her] act was necessary to prevent the greater harm;

"5. That belief was objectively reasonable under all the circumstances; and

"6. The defendant did not substantially contribute to the creation of the emergency."

nature, threatening physical harm, and lacking an alternative, legal course of action. [Citation.] The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged. [Citation.] Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime. [Citations.] [¶] An important factor of the necessity defense involves the balancing of the harm to be avoided as opposed to the costs of the criminal conduct. [Citation.]" (*In re Eichorn* (1998) 69 Cal.App.4th 382, 389 [81 Cal.Rptr.2d 535].) "Necessity is an affirmative public policy defense, in effect a plea in avoidance and justification, which comes into focus only after all elements of the offense have been established." (*People v. Waters* (1985) 163 Cal.App.3d 935, 938 [209 Cal.Rptr. 661].) When public policy considerations do not support a defense of necessity, the trial court need not instruct on that defense. (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 [64 Cal.Rptr.2d 654].)

■ Since the defense of necessity is based on public policy, we must look to public policy to determine whether the defense was available to the defendant on the facts presented here. "[A]side from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71 [78 Cal.Rptr.2d 16, 960 P.2d 1046].)

The duties of a facility that acts as a depositary of living animals are spelled out in the Civil Code. (See Civ. Code, § 1834 et seq.) "A depositary of living animals shall provide the animals with necessary and prompt veterinary care, nutrition, and shelter, and treat them kindly." (Civ. Code, § 1834.) The Legislature has expressly stated the public policy of this state concerning euthanasia of animals. (Civ. Code, § 1834.4.) If an animal is adoptable or, with reasonable efforts, could become adoptable, it should not be euthanized. (*Ibid.*; see also Food & Agr. Code, § 17005.) However, if an animal is abandoned and a new owner cannot be found, the facility "shall thereafter humanely destroy the animal so abandoned." (Civ. Code, § 1834.5.) Particularly relevant to this case and the defendant's assertions is a finding made by the Legislature in 1998: "The Legislature finds and declares that it is better to have public and private shelters pick up or take in animals than private citizens." (Stats. 1998, ch. 752, § 1.)

The Food and Agricultural Code provides specifically for what a shelter must do when a stray cat is impounded. (See Food & Agr. Code, § 31752.) The facility must hold the stray cat for owner redemption for a designated time, usually between four and six days. (Food & Agr. Code, § 31752, subd.

(a).) Prior to the euthanasia of the cat, the facility, at the request of a nonprofit animal rescue or adoption organization, must release the cat to the requesting organization. (Food & Agr. Code, § 31752, subd. (b).) During the holding period, the facility must scan the cat for a microchip that identifies the owner. (Food & Agr. Code, § 31752, subd. (c).) Concerning an animal seized by authorities, the Penal Code provides: "A veterinarian may humanely destroy an impounded animal without regard to the prescribed holding period when it has been determined that the animal has incurred severe injuries or is incurably crippled. A veterinarian also may immediately humanely destroy an impounded animal afflicted with a serious contagious disease unless the owner or his or her agent immediately authorizes treatment of the animal by a veterinarian at the expense of the owner or agent." (Pen. Code, § 597.1, subd. (i).)

To utilize a term from preemption analysis, these statutes occupy the field of what to do with stray cats. The defendant is not at liberty to impose her own will over the public will. Her assertion that it was necessary for her to keep the cats instead of passing them on to animal control flies in the face of legitimately adopted public policy. Accordingly, since her proffered necessity defense is against public policy, the trial court properly denied her request for the necessity instruction and prohibited her from arguing the defense to the jury.[2]

## V-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Sims, J., concurred.

A petition for a rehearing was denied August 23, 2001, and appellant's petition for review by the Supreme Court was denied October 31, 2001.

---

[2] As did the trial court, the Attorney General notes that the necessity defense has been applied only to the prevention of harm to humans. Since we conclude the defendant's proffered defense was contrary to public policy, we need not decide whether it can be applied only to prevention of harm to humans.

*See footnote, ante, page 66.