Filed 6/20/13  P. v. Vanhemert CA2/6

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADRIANUS H.J. VANHEMERT,<br><br>    Defendant and Appellant. | 2d Crim. No. B240063<br>(Super. Ct. No. 2010013619)<br>(Ventura County) |

Appellant Adrianus Vanhemert has a history of traffic encounters with several peace officers in the city of Ojai, including Deputy Michael Harris.  On this occasion, Deputy Harris stopped appellant for unlawfully honking his horn (Veh. Code,[1] § 27001).  After appellant indicated he did not have a valid license or registration, Deputy Harris asked him to step out of his vehicle.  Having seen the deputy approach with his hand on his pistol, and having been informed he could be taken to jail, appellant sped away and drove to the police station.  In the process, he ran stop signs, drove on the wrong side of the road, and caused other drivers to brake to avoid a collision.

_____

[1] All further undesignated statutory references are to the Vehicle Code.

A jury subsequently convicted appellant of evading a peace officer while driving recklessly (§ 2800.2, subd. (a)).  The trial court suspended imposition of sentence and placed him on three years' probation with terms and conditions including that he serve 180 days in county jail.  Appellant contends, inter alia, that he was entitled to have the jury instructed on the defense of necessity pursuant to CALCRIM No. 3403.  He claims the circumstances of his encounter with Deputy Harris, coupled with his prior history with the deputy, led him to believe he was about to be physically harmed.  We conclude there was no substantial evidence to support the instruction.  We also reject appellant's claims that the court erred in excluding the preliminary hearing testimony of a purportedly unavailable witness, and in excluding as inadmissible hearsay certain extrajudicial statements appellant made prior to his arrest.  Accordingly, we affirm.

STATEMENT OF FACTS

On the afternoon of April 15, 2010, Deputy Michael Harris of the Ventura County Sheriff's Department was on uniformed patrol in the city of Ojai when he witnessed appellant unlawfully sound his vehicle horn in violation of section 27001.  Deputy Harris also noticed that appellant's windows may have been tinted in violation of section 26708.  After running a registration check on appellant's vehicle, Deputy Harris decided to make a traffic stop.

Deputy Harris drove up behind appellant and activated his overhead lights.  Appellant continued driving for about two or three minutes before he pulled over.  Deputy Harris got out of his patrol car, started the tape recorder on his gun belt, and placed his hand on his holstered firearm as he approached appellant's vehicle.  The deputy recognized appellant, whom he knew as "Dutch," from prior traffic stops resulting in tickets that appellant had contested.  The deputy also noticed that someone was sitting in the front passenger seat.

Appellant's driver side window was rolled down a few inches.  Deputy Harris told appellant to roll the window down and produce his license and registration.  Appellant handed the deputy registration and insurance cards that were expired and did not produce a license.  When the deputy told appellant he was possibly going to jail for

2

driving without a license, appellant referred to the deputy as "retarded" and called him several other derogatory names.

Deputy Harris asked appellant to step out of his vehicle. Based on prior contacts, the deputy wanted to separate appellant from his passenger so he could have a reasonable conversation with him. Instead of complying, appellant drove off.

Deputy Harris followed appellant with his siren and overhead lights activated. The pursuit was joined by Deputy Jacob Valenzuela, who had arrived in a separate patrol car shortly before appellant drove off. The deputies pursued appellant as he sped through a residential area. Appellant ran several stop signs and other vehicles had to brake to avoid colliding with him. At one point, appellant drove at least 40 miles per hour on the wrong side of a residential street.

Appellant finally stopped at the intersection of Ventura and Santa Ana Streets, just north of the Ojai Police Station. Deputy Harris got out of his patrol car and pointed his gun at appellant's vehicle. When appellant got out of his vehicle, Deputy Harris repeatedly told him to get on the ground and reveal his hands. Appellant did not comply and kept his hands to his sides with his fists clenched. He initially walked in the direction of the deputies, then appeared to walk toward the police station. Deputy Harris reholstered his gun after he could see appellant did not have a weapon.

As appellant began walking toward the police station's office lobby, Deputy Valenzuela pointed his taser at him and ordered him to get on the ground. When appellant continued walking, the deputy used the taser on him and he fell to the ground. Deputy Harris arrested appellant and placed handcuffs on him.

Appellant testified in his own behalf. He was born in Holland and came to the United States in 1986, when he was 32 years old. He moved to Ojai six weeks after arriving in the United States. At some point, he became a part-time chauffer and began acting as a "designated driver" for people who had "too many drinks." The police initially approved, but their attitude changed after appellant began driving an old school bus that allowed him to give rides to a couple hundred people every weekend. Since

3

February of 2008, appellant had been pulled over by the police over 30 to 40 times and had received about 40 tickets.

Appellant believed he was being harassed by the police, and by Deputy Harris in particular. Appellant had challenged some of the deputy's tickets in court. On one such occasion, the two exchanged words and Deputy Harris "stormed" out because he was unhappy with the result. Other encounters appellant had with the deputy were friendly, however.

On the day of the incident, appellant was giving someone a ride to the train station when he honked his horn at a friend who was walking her dog. Appellant continued driving until he noticed he was being pulled over. When Deputy Harris approached, appellant rolled his window up a few inches because the deputy "had his hand on his gun and . . . opened up his clip." Appellant was afraid that "because of what happened in the courtroom, that something was going to happen, you know, he snapped or something like that."

Deputy Harris told appellant to roll his window down, but appellant refused and exchanged "a couple of choice words" with him. Appellant asked why he was being pulled over, and the deputy said something about honking his horn in a residential area. Appellant told the deputy, "You know, you're not that cute." Deputy Harris asked appellant for his license, proof of insurance, and registration. Appellant did not know where the papers were because the car was registered to his stepson. When he went to retrieve his license from his pocket, he realized he did not have it with him.

Deputy Harris told appellant that driving without his license was a good reason to arrest him and take him to jail. Appellant then complied with the deputy's order to get out of his vehicle. The deputy's statement that he was going to take appellant to jail, coupled with the fact that he had his hand on his gun throughout most of the exchange, caused appellant to fear for his safety. According to appellant, "I decided to get back in my car and get protection from more people. If he was going to arrest me, I don't know if I ever was going to show up at the police station. I might have showed up at the east end somewhere." Appellant got into his car without the deputy's permission

4

and said, "Let's go." He intended to drive to the police station and file a complaint against Deputy Harris.

DISCUSSION

I.

*Refusal to Instruct on Necessity Defense (CALCRIM No. 3403)*

"By definition, the necessity defense is founded upon public policy and provides a justification distinct from the elements required to prove the crime. [Citation.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900-901.) "The situation presented to the defendant must be of an emergency nature, threatening physical harm, and lacking an alternative, legal course of action. The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged." (*Id.* at p. 901, citations omitted.) Appellant contends he was presented with such an emergency situation when he evaded Deputy Harris, and that the court thus erred in refusing his request to instruct the jury as set forth in CALCRIM No. 3403.[2] We disagree. Fleeing from a peace officer and endangering the lives and property of others through reckless driving, purportedly to avoid an objectively unreasonable fear of some unspecified physical harm, does not entitle one to claim the defense of necessity. On the facts of this case the claim lacks any substantial evidence to support it and is, at best, specious.

---

[2] CALCRIM No. 3403 states: "The defendant is not guilty of [any crime] if (he/she) acted because of legal necessity. [¶] In order to establish this defense, the defendant must prove that: [¶] 1 (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/ [or] someone else); [¶] 2 (He/She) had no adequate legal alternative; [¶] 3 The defendant's acts did not create a greater danger than the one avoided; [¶] 4 When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil; [¶] 5 A reasonable person would also have believed that the act was necessary under the circumstances; [¶] AND [¶] 6 The defendant did not substantially contribute to the emergency. [¶] The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

5

The trial court must instruct on the general principles of law openly and closely connected with the case and necessary for the jury's understanding of the case, including any defenses on which the defendant relies or which are supported by substantial evidence and not inconsistent with the defendant's theory of the case. (*People v. Boyer* (2006) 38 Cal.4th 412, 468–469.) The court need not, however, instruct on theories that lack substantial evidentiary support. (*People v. Miceli* (2002) 104 Cal.App.4th 256, 267.)

"Except as to crimes that include lack of necessity (or good cause) as an element, necessity is an affirmative defense recognized based on public policy considerations. [Citations.] To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that she violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which she did not substantially contribute to the emergency." (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1134-1135 (*Kearns*).) "Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime." (*People v. Heath, supra,* 207 Cal.App.3d at p. 901.) Because the necessity defense does not negate an element of the crime for which the defense was offered, appellant bore the burden of proving the defense by a preponderance of the evidence. (*Ibid.*; *In re Eichorn* (1998) 69 Cal.App.4th 382, 389; *Kearns,* at p. 1135.)[3]

In urging the court to give CALCRIM No. 3403, appellant offered that "the necessity would come from his fear of being taken to jail or worse" and added, "he wound up getting tased approaching a police station with his hands in the air. And just

---

[3] For the first time in his reply brief, appellant claims he was only required to raise a reasonable doubt whether the defense of necessity applied. We are satisfied that appellant had to establish the defense by a preponderance of the evidence. (*Heath, supra*, 207 Cal.App.3d at pp. 900-901; CALCRIM No. 3403.) Even if the lesser burden of proof applied, appellant's evidence was insufficient to warrant an instruction.

the fact that the two had collided in the past in court. . . . And the tinted windows he was never charged with. His windows were legal." When the court asked what "emergency" prompted appellant to act, counsel replied, "The emergency was that he was going to be taken to jail or something else and just for saying I don't have my license." The court correctly found this offer of proof inadequate to support an instruction on the necessity defense. Appellant did not point to any "emergency" that would justify his actions. The fact that appellant had "collided in the past in court" with Deputy Harris did not give rise to an objectively reasonable belief that the deputy was going to subject him to significant bodily harm or similar evil. Even if appellant had reasonably harbored such a belief, he could have asked Deputy Valenzuela to intervene on his behalf. Instead, appellant endangered the safety of others by speeding and running stop signs. Several drivers had to swerve to avoid colliding with him. In this regard, appellant plainly created a danger greater than the one he purportedly sought to avoid. His request to instruct the jury with CALCRIM No. 3403 was thus properly refused.

II.

*Former Testimony of Unavailable Witness (Evid. Code, § 1291)*

Appellant asserts the court erred in excluding the preliminary hearing testimony of James Cooke Hartnett, who was a passenger in appellant's vehicle during the incident. He claims that Hartnett's prior testimony was admissible under Evidence Code section 1291 because he made the requisite showing that Hartnett was unavailable to testify at trial. We disagree.

Evidence Code section 1291, subdivision (a) provides in pertinent part that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness . . . ." Subdivision (a)(5) of Evidence Code section 240 provides that a declarant is unavailable as a witness if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Generally, "'[w]hat constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. [Citation.] The term is incapable

7

of a mechanical definition. It has been said that the word "diligence" connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citation.] The totality of efforts of the proponent to achieve [the] presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available [citation], whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation].' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 523.)

The trial court's ruling on due diligence presents a mixed question of fact and law subject to our independent review. (*People v. Cromer* (2001) 24 Cal.4th 889, 892-893.) To the extent the court resolved evidentiary conflicts regarding historical facts, we review the findings for the existence of substantial evidence. (*Id.* at pp. 894, 900–902.)

As an offer of proof for Hartnett's unavailability, defense counsel represented that she and appellant had repeatedly called Hartnett's mother in an effort to discover his whereabouts. The mother told appellant that Hartnett was in either Portland or Canada. When counsel tried to subpoena Hartnett's mother for the purpose of locating Hartnett, it was discovered she had moved and her whereabouts were unknown. Counsel also claimed she had subpoenaed Hartnett for a prior trial date over a year earlier, but she did not have a proof of service. According to counsel, Hartnett disappeared after receiving a letter from the Orange County District Attorney stating that he would be arrested if he appeared as a witness. Counsel never saw such a letter, but "begged" Hartnett's mother to have him call counsel so that she could help him with the Orange County matter. When the court asked whether she had sought a warrant after Hartnett failed to appear under the subpoena, counsel responded that she had not done so "[b]ecause I was told he was gone and out of the jurisdictional reach and so I just asked that we be allowed to use his preliminary." Counsel also offered that she "made efforts through Google" to locate Hartnett.

8

We agree with the court's finding that appellant failed to establish he exercised reasonable diligence in seeking to secure Hartnett's attendance at trial. Although counsel claimed she subpoenaed Hartnett for a prior trial date, she did not provide the court with the subpoena or a proof of service. Moreover, counsel did not ask the court to issue a warrant after Hartnett failed to appear in response to the subpoena. Contrary to counsel's implication, our state courts had the power to procure Hartnett's attendance at appellant's trial even if he was in Oregon or Canada. (Pen. Code, § 1334 et seq.; 28 U.S.C. § 1783; *People v. Herrera* (2010) 49 Cal.4th 613, 626.)[4]

Even if appellant established that he exercised reasonable diligence in procuring Hartnett's attendance, the court's exclusion of Hartnett's prior testimony was harmless. Hartnett essentially testified that (1) appellant was stopped after honking his horn at a friend; (2) Deputy Harris approached appellant's vehicle with his weapon in his hand; (3) appellant said he was going to the police station after he was stopped; (4) appellant walked to the front door of the police station with his hands raised in the air while Deputy Harris and several other officers had their guns drawn; and (5) an officer other than Deputy Harris shot appellant with a taser gun. Because none of this testimony bolsters appellant's proffered defense of necessity, any error in its exclusion was harmless. (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*); *Chapman v. California* (1967) 386 U.S. 18.)

### III.

### *Extrajudicial Statements*

In his final claim, appellant challenges the court's hearsay exclusion of a witness's testimony that he heard appellant say, "this isn't right" as he was walking to the front door of the police station. For the first time on appeal, appellant contends the statement should have been admitted under the state of mind exception to the hearsay

---

**4** In his reply brief, appellant essentially claims it is of no moment whether he could have compelled Harnett's attendance from Canada because appellant did not have any information regarding his precise location. Trial counsel admitted, however, that she made no further effort to locate appellant after being told he was in Canada because she believed "he was gone and out of the jurisdictional reach . . . ."

9

rule. This claim was not raised below, so it is forfeited. (*People v. Dixon* (2007) 153 Cal.App.4th 985, 997.) In any event, appellant fails to establish prejudice. His statement "this isn't right" had no tendency to prove any element of the necessity defense. Rather, it merely demonstrated his belief that he was being treated unfairly. Because the result would have been no different had the statement been admitted, its exclusion was harmless. (*People v. Boyette* (2002) 29 Cal.4th 381, 429; *Watson, supra*, 46 Cal.2d at p. 837.)

## CONCLUSION

It is clear that appellant has a longstanding dispute with the sheriff's deputies serving in Ojai, and in particular with Deputy Harris. However sincere his beliefs of persecution may be, he may not engage in life threatening conduct and then take shelter in a claim that it was legally necessary to do so. Appellant's dispute with this officer on this occasion would have been properly settled before a judge in traffic court as had been done before. Appellant had no legally justifiable reason to evade the deputy; he was not entitled to a jury instruction to that effect.

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.

We concur:


GILBERT, P. J.


YEGAN, J.

Patricia M. Murphy, Judge

Superior Court County of Ventura

_____


Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Rene Judkiewicz, Deputy Attorney General, for Plaintiff and Respondent.