**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWARD JONES; PATRICIA VINSON;
GEORGE VINSON; THOMAS CASH;
STANLEY BARGER; ROBERT LEE
PURRIE,
        *Plaintiffs-Appellants,*

v.

CITY OF LOS ANGELES; WILLIAM
BRATTON, Chief; CHARLES BECK,
Captain, in their official capacity,
        *Defendants-Appellees.*

No. 04-55324

D.C. No.
CV-03-01142-ER

OPINION

Appeal from the United States District Court
for the Central District of California
Edward Rafeedie, District Judge, Presiding

Argued and Submitted
December 6, 2005—Pasadena, California

Filed April 14, 2006

Before: Pamela Ann Rymer and Kim McLane Wardlaw,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Opinion by Judge Wardlaw;
Dissent by Judge Rymer

---

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

## COUNSEL

Ben Wizner, Peter Eliasberg, and Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, California; Carol A. Sobel, Law Offices of Carol A. Sobel, Santa Monica, California; and Adam B. Wolf, Los Angeles, California, for the plaintiffs-appellants.

Amy Jo Field, Deputy City Attorney, Los Angeles, California, for the defendants-appellees.

**OPINION**

WARDLAW, Circuit Judge:

Six homeless individuals, unable to obtain shelter on the night each was cited or arrested, filed this Eighth Amendment challenge to the enforcement of a City of Los Angeles ordinance that criminalizes sitting, lying, or sleeping on public streets and sidewalks at all times and in all places within Los Angeles's city limits. Appellants seek limited injunctive relief from enforcement of the ordinance during nighttime hours, i.e., between 9:00 p.m. and 6:30 a.m., or at any time against the temporarily infirm or permanently disabled. We must decide whether the Eighth Amendment right to be free from cruel and unusual punishment prohibits enforcement of that law as applied to homeless individuals involuntarily sitting, lying, or sleeping on the street due to the unavailability of shelter in Los Angeles.

## I.   Facts and Procedural Background

The facts underlying this appeal are largely undisputed. Edward Jones, Patricia Vinson, George Vinson, Thomas Cash, Stanley Barger, and Robert Lee Purrie ("Appellants") are homeless individuals who live on the streets of Los Angeles's Skid Row district. Appellees are the City of Los Angeles, Los Angeles Police Department ("L.A.P.D.") Chief William Bratton, and Captain Charles Beck ("Appellees" or "the City"). Federal law defines the term "homeless individual" to include

> (1) an individual who lacks a fixed, regular, and adequate nighttime residence; and

> (2) an individual who has a primary nighttime residence that is—

> (A) a supervised publicly or privately operated shelter designed to provide temporary living accom-

modations (including welfare hotels, congregate shelters, and transitional housing for the mentally ill);

(B) an institution that provides a temporary residence for individuals intended to be institutionalized; or

(C) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.

Stewart B. McKinney Homeless Assistance Act of 1987 § 103(a), 42 U.S.C. § 11302(a) (2000). Appellants are six of the more than 80,000 homeless individuals in Los Angeles County on any given night. *See* L.A. Homeless Servs. Auth., Los Angeles Continuum of Care, Exhibit 1 Narrative, at 2-17 (2001); *see also* Patrick Burns et al., Econ. Roundtable, Homeless in LA: A Working Paper for the 10-Year Plan To End Homelessness in Los Angeles County (2003) (estimating that more than 253,000 individuals were homeless in Los Angeles County at some point during 2002).

The term "Skid Row" derives from the lumber industry practice of building a road or track made of logs laid crosswise over which other logs were slid. Christine Ammer, The American Heritage Dictionary of Idioms 382 (paperback ed. 2003). By the 1930s, the term was used to describe the area of town frequented by loggers and densely populated with bars and brothels. *Id.* Beginning around the end of the nineteenth century, the area now known as Los Angeles's Skid Row became home to a transient population of seasonal laborers as residential hotels began to develop. *See* Mayor's Citizens' Task Force on Cent. City East, To Build a Community 5 (1988). For decades Skid Row has been home for "the down and out, the drifters, the unemployed, and the chronic alcoholic[s]" of Los Angeles. *Id.* Covering fifty city blocks immediately east of downtown Los Angeles, Skid Row is bordered

by Third Street to the north, Seventh Street to the south, Alameda Street to the east, and Main Street to the west.

Los Angeles's Skid Row has the highest concentration of homeless individuals in the United States. Charlie LeDuff, *In Los Angeles, Skid Row Resists an Upgrade*, N.Y. Times, July 15, 2003, at A1. According to the declaration of Michael Alvidrez, a manager of single-room-occupancy ("SRO") hotels in Skid Row owned by the Skid Row Housing Trust, since the mid-1970s Los Angeles has chosen to centralize homeless services in Skid Row. *See also* Edward G. Goetz, *Land Use and Homeless Policy in Los Angeles*, 16 Int'l. J. Urb. & Regional Res. 540, 543 (1992) (discussing the City's long-standing "policy of concentrating and containing the homeless in the Skid Row area"). The area is now largely comprised of SRO hotels (multi-unit housing for very low income persons typically consisting of a single room with shared bathroom), shelters, and other facilities for the homeless.

Skid Row is a place of desperate poverty, drug use, and crime, where Porta-Potties serve as sleeping quarters and houses of prostitution. Steve Lopez, *A Corner Where L.A. Hits Rock Bottom*, L.A. Times, Oct. 17, 2005, at A1. Recently, it has been reported that local hospitals and law enforcement agencies from nearby suburban areas have been caught "dumping" homeless individuals in Skid Row upon their release. Cara Mia DiMassa & Richard Winton, *Dumping of Homeless Suspected Downtown*, L.A. Times, Sept. 23, 2005, at A1. This led Los Angeles Mayor Antonio Villaraigosa to order an investigation into the phenomenon in September 2005. Cara Mia DiMassa & Richard Fausset, *Mayor Orders Probe of Skid Row Dumping*, L.A. Times, Sept. 27, 2005, at B1. L.A.P.D. Chief William Bratton, insisting that the Department does not target the homeless but only people who violate city ordinances (presumably including the ordinance at issue), has stated:

"If the behavior is aberrant, in the sense that it breaks the law, then there are city ordinances. . . . You arrest them, prosecute them. Put them in jail. And if they do it again, you arrest them, prosecute them, and put them in jail. It's that simple."

Cara Mia DiMassa & Stuart Pfeifer, *2 Strategies on Policing Homeless*, L.A. Times, Oct. 6, 2005, at A1 [hereinafter DiMassa, *Policing Homeless*] (omission in original) (quoting Chief Bratton). This has not always been City policy. The ordinance at issue was adopted in 1968. *See* L.A., Cal., Ordinance 137,269 (Sept. 11, 1968). In the late 1980s, James K. Hahn, who served as Los Angeles City Attorney from 1985 to 2001 and subsequently as Mayor, refused to prosecute the homeless for sleeping in public unless the City provided them with an alternative to the streets. Frederick M. Muir, *No Place Like Home: A Year After Camp Was Closed, Despair Still Reigns on Skid Row*, L.A. Times, Sept. 25, 1988, § 2 (Metro), at 1.

For the approximately 11,000-12,000 homeless individuals in Skid Row, space is available in SRO hotels, shelters, and other temporary or transitional housing for only 9000 to 10,000, leaving more than 1000 people unable to find shelter each night. *See* Mayor's Citizens' Task Force, *supra*, at 5. In the County as a whole, there are almost 50,000 more homeless people than available beds. *See* L.A. Homeless Servs. Auth., *supra*, at 2-14. In 1999, the fair market rent for an SRO room in Los Angeles was $379 per month. L.A. Housing Crisis Task Force, In Short Supply 6 (2000). Yet the monthly welfare stipend for single adults in Los Angeles County is only $221. *See* L.A. Homeless Servs. Auth., *supra*, at 2-10. Wait-lists for public housing and for housing assistance vouchers in Los Angeles are three- to ten-years long. *See* The U.S. Conference of Mayors, A Status Report on Hunger and Homelessness in America's Cities 101, 105 (2002) [hereinafter Homelessness Report];[1] L.A. Housing Crisis Task Force, *supra*, at 7.

_____

[1] It is unclear on what basis the dissent asserts that this report "does not indicate that Los Angeles was among the cities surveyed," or that it "is the

The result, in City officials' own words, is that " '[t]he gap between the homeless population needing a shelter bed and the inventory of shelter beds is severely large.' " Homeless-ness Report, *supra*, at 80. As Los Angeles's homeless popula-tion has grown, *see id.* at 109 (estimating annualized growth of ten percent in Los Angeles's homeless population in the years up to and including 2003), the availability of low-income housing in Skid Row has shrunk, according to the declaration of Alice Callaghan, director of a Skid Row com-munity center and board member of the Skid Row Housing Trust. According to Callaghan's declaration, at night in Skid Row, SRO hotels, shelters, and other temporary or transitional housing are the only alternatives to sleeping on the street; dur-ing the day, two small parks are open to the public. Thus, for many in Skid Row without the resources or luck to obtain shelter, sidewalks are the only place to be.

As will be discussed below, Appellants' declarations dem-onstrate that they are not on the streets of Skid Row by informed choice. In addition, the Institute for the Study of Homelessness and Poverty reports that homelessness results from mental illness, substance abuse, domestic violence, low-paying jobs, and, most significantly, the chronic lack of affordable housing. Inst. for the Study of Homelessness and Poverty, "Who Is Homeless in Los Angeles?" 3 (2000). It also reports that between 33% and 50% of the homeless in Los Angeles are mentally ill, and 76% percent of homeless adults in 1990 had been employed for some or all of the two years prior to becoming homeless. *Id*. at 2; *see also* Grace R. Dyr-ness et al., Crisis on the Streets: Homeless Women and Chil-dren in Los Angeles 14 (2003) (noting that approximately

only study in the record." Throughout the report, including on page 96 and on the final page, Los Angeles is named as one of the twenty-five sur-veyed cities. The record includes more than a half dozen public reports Appellants filed in support of their motion for summary judgment, without objection.

14% of homeless individuals in Los Angeles are victims of domestic violence).

Against this background, the City asserts the constitutionality of enforcing Los Angeles Municipal Code section 41.18(d) against those involuntarily on the streets during nighttime hours, such as Appellants. It provides:

> No person shall sit, lie or sleep in or upon any street, sidewalk or other public way.

> The provisions of this subsection shall not apply to persons sitting on the curb portion of any sidewalk or street while attending or viewing any parade permitted under the provisions of Section 103.111 of Article 2, Chapter X of this Code; nor shall the provisions of this subsection supply [sic] to persons sitting upon benches or other seating facilities provided for such purpose by municipal authority by this Code.

L.A., Cal., Mun. Code § 41.18(d) (2005). A violation of section 41.18(d) is punishable by a fine of up to $1000 and/or imprisonment of up to six months. *Id.* § 11.00(m).

Section 41.18(d) is one of the most restrictive municipal laws regulating public spaces in the United States. The City can secure a conviction under the ordinance against anyone who merely sits, lies, or sleeps in a public way at any time of day. Other cities' ordinances similarly directed at the homeless provide ways to avoid criminalizing the status of homelessness by making an element of the crime some conduct in combination with sitting, lying, or sleeping in a state of homelessness. For example, Las Vegas prohibits standing or lying in a public way only when it obstructs pedestrian or vehicular traffic. *See, e.g.*, Las Vegas, Nev., Mun. Code § 10.47.020 (2005) ("It is unlawful to intentionally obstruct pedestrian or vehicular traffic . . . ."). Others, such as Portland, prohibit

"camping" in or upon any public property or public right of way. *See, e.g.*, Portland, Or., Mun. Code §§ 14A.50.020, .030 (2006) (prohibiting obstruction of public sidewalks in a designated area or camping on public property). Still others contain safe harbor provisions such as limiting the hours of enforcement. *See, e.g.*, Seattle, Wash., Mun. Code § 15.48.040 (2005) ("No person shall sit or lie down upon a public sidewalk . . . during the hours between seven (7:00) a.m. and nine (9:00) p.m. in the following zones . . . ."); Tucson, Ariz., Mun. Code § 11-36.2(a) (2005) (same, except prohibition extended to 10:00 p.m.); Houston, Tex., Mun. Code § 40-352(a) (2006) (same, except prohibition extended to 11:00 p.m.). Other cities include as a required element sitting, lying, or sleeping in clearly defined and limited zones. *See, e.g.*, Philadelphia, Pa., Mun. Code § 10-611(1)(b)-(c), (2)(g)-(h) (2005) (prohibiting sitting or lying in certain designated zones only); Reno, Nev., Mun. Code § 8.12.015(b) (2005) (similar); Seattle, Wash., Mun. Code § 15.48.040 (similar). As a result of the expansive reach of section 41.18(d), the extreme lack of available shelter in Los Angeles, and the large homeless population, thousands of people violate the Los Angeles ordinance every day and night, and many are arrested, losing what few possessions they may have.[2] Appellants are among them.

Robert Lee Purrie is in his early sixties. He has lived in the Skid Row area for four decades. Purrie sleeps on the streets because he cannot afford a room in an SRO hotel and is often unable to find an open bed in a shelter. Early in the morning of December 5, 2002, Purrie declares that he was sleeping on the sidewalk at Sixth Street and Towne Avenue because he "had nowhere else to sleep." At 5:20 a.m., L.A.P.D. officers cited Purrie for violating section 41.18(d). He could not afford to pay the resulting fine.

---

[2]During oral argument, the attorney for the City asserted that L.A.P.D. officers leaflet Skid Row the day before making their section 41.18(d) sweeps to warn the homeless, and do not cite or arrest people for violating section 41.18(d) unless there are open beds in homeless shelters at the time of the violations. No evidence in the record supports these assertions.

Purrie was sleeping in the same location on January 14, 2003, when police officers woke him early in the morning and searched, handcuffed, and arrested him pursuant to a warrant for failing to pay the fine from his earlier citation. The police removed his property from his tent, broke it down, and threw all of his property, including the tent, into the street. The officers also removed the property and tents of other homeless individuals sleeping near Purrie. After spending the night in jail, Purrie was convicted of violating section 41.18(d), given a twelve month suspended sentence, and ordered to pay $195 in restitution and attorneys' fees. Purrie was also ordered to stay away from the location of his arrest. Upon his release, Purrie returned to the corner where he had been sleeping on the night of his arrest to find that all the belongings he had left behind, including blankets, clothes, cooking utensils, a hygiene kit, and other personal effects, were gone.

Stanley Barger suffered a brain injury in a car accident in 1998 and subsequently lost his Social Security Disability Insurance. His total monthly income consists of food stamps and $221 in welfare payments. According to Barger's declaration, he "want[s] to be off the street" but can only rarely afford shelter. At 5:00 a.m. on December 24, 2002, Barger was sleeping on the sidewalk at Sixth and Towne when L.A.P.D. officers arrested him. Barger was jailed, convicted of violating section 41.18(d), and sentenced to two days time served.

When Thomas Cash was cited for violating section 41.18(d), he had not worked for approximately two years since breaking his foot and losing his job, and had been sleeping on the street or in a Skid Row SRO hotel. Cash suffers from severe kidney problems, which cause swelling of his legs and shortness of breath, making it difficult for him to walk. At approximately noon on January 10, 2003, Cash tired as he walked to the SRO hotel where he was staying. He was resting on a tree stump when L.A.P.D. officers cited him.

Edward Jones's wife, Janet, suffers serious physical and mental afflictions. Edward takes care of her, which limits his ability to find full-time work, though he has held various minimum wage jobs. The Joneses receive $375 per month from the Los Angeles County General Relief program, enabling them to stay in Skid Row SRO hotels for the first two weeks of each month. Because shelters separate men and women, and Janet's disabilities require Edward to care for her, the Joneses are forced to sleep on the streets every month after their General Relief monies run out. At 6:30 a.m. on November 20, 2002, Edward and Janet Jones were sleeping on the sidewalk at the corner of Industrial and Alameda Streets when the L.A.P.D. cited them for violating section 41.18(d).

Patricia and George Vinson, a married couple, were looking for work and a permanent place to live when they were cited for violating section 41.18(d). They use their General Relief payments to stay in motels for part of every month and try to stay in shelters when their money runs out. On the night of December 2, 2002, they missed a bus that would have taken them to a shelter and had to sleep on the sidewalk near the corner of Hope and Washington Streets instead. At 5:30 a.m. the next morning, L.A.P.D. officers cited the Vinsons for violating section 41.18(d).

The record before us includes declarations and supporting documentation from nearly four dozen other homeless individuals living in Skid Row who have been searched, ordered to move, cited, arrested, and/or prosecuted for, and in some cases convicted of, violating section 41.18(d). Many of these declarants lost much or all of their personal property when they were arrested.

On February 19, 2003, Appellants filed a complaint in the United States District Court for the Central District of California pursuant to 42 U.S.C. § 1983. They seek a permanent injunction against the City of Los Angeles and L.A.P.D. Chief

William Bratton and Captain Charles Beck (in their official capacities), barring them from enforcing section 41.18(d) in Skid Row between the hours of 9:00 p.m. and 6:30 a.m. Appellants allege that by enforcing section 41.18(d) twenty-four hours a day against persons with nowhere else to sit, lie, or sleep, other than on public streets and sidewalks, the City is criminalizing the status of homelessness in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article I, sections 7 and 17 of the California Constitution, *see* Cal. Const. art I, § 7 (guaranteeing due process and equal protection); *id*. § 17 (prohibiting cruel and unusual punishment). Appellants abandoned their second claim pursuant to 42 U.S.C. § 1983, alleging violations of a Fourteenth Amendment substantive due process right to treatment for chronic illnesses while in police custody, in the district court. On cross-motions for summary judgment, the district court granted judgment in favor of the City. Relying heavily on *Joyce v. City and County of San Francisco*, 846 F. Supp. 843 (N.D. Cal. 1994), the district court held that enforcement of the ordinance does not violate the Eighth Amendment because it penalizes conduct, not status. This appeal timely followed.

## II. Standard of Review

The parties dispute the appropriate standard of review. Appellants argue that the district court's denial of summary judgment should be reviewed de novo, while the City argues that the abuse of discretion standard applies because the district court denied a request for equitable relief. Although we review a district court's summary judgment order granting or denying a permanent injunction for abuse of discretion, *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004), we review any determination underlying the court's decision under the standard applicable to that determination, *United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005). Therefore, we review de novo the district court's legal determination that a statute is constitutional, *United States v. Labrada-Bustamante*, 428 F.3d 1252, 1262

(9th Cir. 2005), and we review for clear error the district court's findings of fact, *Metropolitan Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006). We also review de novo the district court's decision to grant or deny summary judgment. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).

## III.  Discussion

### A.  Standing

The City challenges Appellants' standing for the first time on appeal. We nevertheless consider this challenge because the question of standing is jurisdictional and may be raised at any time by the parties, *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1085 (9th Cir. 2003), or *sua sponte*, *see RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056 (9th Cir. 2002) (raising issue of standing, but remanding for further development of the record). We conclude that Appellants have standing to bring this action.

The City's contention that standing requires Appellants to have been convicted under the ordinance ignores established standing principles. The City also argues Appellants lack standing because, after being arrested, jailed, and losing their belongings, Appellants could theoretically raise a necessity defense if they were prosecuted. This argument is legally, factually, and realistically untenable.[3]

---

[3]As a practical matter, it is questionable how homeless individuals would either know that they could assert a necessity defense or have the wherewithal to hire an attorney who might so advise them, particularly after being arrested, serving jail time, and losing their belongings. The argument that at trial a homeless individual would have recourse to a necessity defense so as to avoid conviction begs the question why the City arrests homeless individuals during nighttime in the first place, other than out of indifference or meanness. As the Los Angeles City Attorney has publicly stated, " 'The tragedy of homelessness is compounded by indifference.' " Anat Rubin, *"Jobs, Not Jails," Skid Row Protesters Shout at*

**[1]** Article III of the Constitution requires a plaintiff seeking to invoke the jurisdiction of the federal courts to allege an actual case or controversy. To satisfy the case or controversy requirement, the party invoking a court's jurisdiction must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (citation and internal quotation marks omitted). In a suit for prospective injunctive relief, a plaintiff is required to demonstrate a real and immediate threat of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (holding that the threat must be " 'real and immediate' " as opposed to " 'conjectural' or 'hypothetical' "). The key issue is whether the plaintiff is "likely to suffer future injury." *Id.* at 105; *see also O'Shea v. Littleton*, 414 U.S. 488, 496, 498 (1974).

**[2]** Where the plaintiff seeks to enjoin criminal law enforcement activities against him, standing depends on the plaintiff's ability to avoid engaging in the illegal conduct in the future. *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (en banc) (citing *Spencer v. Kemna*, 523 U.S. 1, 15 (1998)). The plaintiff need only establish that there is a reasonable expectation that his conduct will recur, triggering the alleged harm; he need not show that such recurrence is probable. *See Honig v. Doe*, 484 U.S. 305, 318 & n.6 (1988); *id.* at 320 (distinguishing, *inter alia*, *Lyons*, 461 U.S. at 105-06). Avoiding illegal conduct may be impossible when the underlying criminal statute is unconstitutional. *See*

---

*Politicos*, L.A. Daily J., Feb. 22, 2006, at 1 (quoting the City Attorney). Yet the National Coalition for the Homeless recently named Los Angeles one of the twenty "meanest" cities in the United States in its treatment of the homeless. Nat'l Coal. for the Homeless & Nat'l Law Ctr. on Homelessness & Poverty, A Dream Denied: The Criminalization of Homelessness in U.S. Cities 10, 40-41 (2006).

*O'Shea*, 414 U.S. at 496 (noting that plaintiffs may have had standing had they alleged that the laws under which they feared prosecution in the future were unconstitutional); *Perez v. Ledesma*, 401 U.S. 82, 101-02 (1971) (Brennan, J., concurring in part and dissenting in part) (noting prior aggressive prosecution under an allegedly unconstitutional law as a factor for finding sufficient controversy for declaratory relief). Past exposure to allegedly unlawful state action, while not alone sufficient to establish a present case or controversy, is "evidence bearing on whether there is a real and immediate threat of repeated injury." *Lyons*, 461 U.S. at 102 (internal quotation marks omitted).

**[3]** Appellants seek only prospective injunctive relief, not damages. They do not ask for section 41.18(d) to be declared facially unconstitutional; they seek only to have its enforcement enjoined in a small area of the city during nighttime hours. Appellants have demonstrated both past injuries and a real and immediate threat of future injury: namely, they have been and are likely to be fined, arrested, incarcerated, prosecuted, and/or convicted for involuntarily violating section 41.18(d) at night in Skid Row. These law enforcement actions restrict Appellants' personal liberty, deprive them of property, and cause them to suffer shame and stigma. In the absence of any indication that the enormous gap between the number of available beds and the number of homeless individuals in Los Angeles generally and Skid Row in particular has closed, Appellants are certain to continue sitting, lying, and sleeping in public thoroughfares and, as a result, will suffer direct and irreparable injury from enforcement of section 41.18(d). As L.A.P.D. Chief Bratton has promised, they will be arrested, prosecuted, and put in jail repeatedly, if necessary. *See* DiMassa, *Policing Homeless*, *supra*. Appellants have therefore alleged an actual case or controversy and have standing to bring this suit.

In arguing that Appellants lack standing, the City misrelies upon dicta in *Ingraham v. Wright*, 430 U.S. 651 (1977), for

the proposition that the Cruel and Unusual Punishment Clause attaches only postconviction. It contends that Appellants have suffered a constitutionally cognizable harm only if they have been convicted and/or face an imminent threat of future conviction. The City asserts that Appellants have not adequately demonstrated that they have been convicted and/or are likely to be convicted in the future under section 41.18(d).

**[4]** *Ingraham* addressed a claim that the Cruel and Unusual Punishment Clause bars the use of disciplinary corporal punishment in public schools. *Id.* at 668. The Court explained that the Clause places three distinct limits on the state's criminal law powers:

> First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such.

*Id.* at 667 (citations omitted). Reviewing the history of the Eighth Amendment, the *Ingraham* Court concluded that the Clause does not regulate state action "outside the criminal process." *Id.* at 667-68. It reasoned that because the context of disciplining schoolchildren is "wholly different" from that of punishing criminals, disciplinary corporal punishment is not subject to Eighth Amendment scrutiny. *Id.* at 669-71.

**[5]** *Ingraham* rests on the distinction between state action inside and "outside the criminal process," *id.* at 667, not on any distinction between criminal convictions and preconviction law enforcement measures such as arrest, jailing, and prosecution. *See id.* at 686 (White, J., dissenting) (explaining that the Court's reasoning depends on the "distinction between criminal and noncriminal punishment"). Thus, contrary to the City's and the dissent's argument, *Ingraham* does not establish that the Cruel and Unusual Punishment Clause

only attaches postconviction. In fact, the *Ingraham* decision expressly recognizes that the Clause "imposes substantive limits on what can be made criminal," *id.* at 667 (Powell, J., majority opinion), a protection that attaches before conviction, and the very one Appellants seek in this case.

The City and the dissent advance out of context the following dicta from *Ingraham* to support their contention that a conviction is necessary before one has standing to invoke our jurisdiction: "[the Cruel and Unusual Punishment Clause] was designed to protect those convicted of crimes," *id.* at 664; and "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law," *id.* at 671 n.40. However, that language is relevant only to the first two of the three circumscriptions on the criminal process identified by the *Ingraham* Court: limits on the kind and proportionality of punishment permissible postconviction. That language is inapplicable when the challenge is based on the third category of limitations, "on what can be made criminal and punished as such." *Id.* at 667.

The Clause's first two protections govern the particulars of criminal punishment, "what kind" and "how much," covering only those who have been convicted of a criminal violation and face punitive sanctions. A plaintiff alleging violations of the first or second protections, therefore, has not suffered constitutionally cognizable harm unless he has been convicted. *See, e.g.*, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983) (holding that the Eighth Amendment does not apply to a claim involving deliberate indifference by government officials to the medical needs of an injured suspect before his arrest). Thus, in *Hawkins v. Comparet-Cassani*, we relied upon the above *Ingraham* dicta in holding that plaintiffs who had not been convicted lacked standing under the Eighth Amendment to challenge the use of electric stun belts during court proceedings, a claim that arose under the first two protections of the Clause. 251 F.3d 1230, 1238 (9th Cir. 2001).

The Cruel and Unusual Punishment Clause's third protection, however, differs from the first two in that it limits what the state can criminalize, not how it can punish. *See Ingraham*, 430 U.S. at 667. This protection governs the criminal law process as a whole, not only the imposition of punishment postconviction. *See, e.g.*, *Robinson v. California*, 370 U.S. 660, 666 (1962) ("[A] law which made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment . . . ."); *see also Ingraham*, 430 U.S. at 664, 666 (explaining that the Eighth Amendment concerns "the criminal process" and seeks "to limit the power of those entrusted with the criminal-law function of government"). If the state transgresses this limit, a person suffers constitutionally cognizable harm as soon as he is subjected to the criminal process. This may begin well before conviction: at arrest, *see, e.g.*, *McNabb v. United States*, 318 U.S. 332, 343-44 (1943) (the requirement "that the police must with reasonable promptness show legal cause for detaining arrested persons" is part of the "process of criminal justice"); at citation, *see, e.g.*, *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, I.L.G.W.U.*, 605 F.2d 1228, 1249-50 (2d Cir. 1979) (issuance by the police of an "Appearance Ticket" compelling an individual to appear in court commenced the criminal process); or even earlier, *see Dickey v. Florida*, 398 U.S. 30, 43 (1970) (the criminal process may begin pre-arrest, as soon as the state decides to prosecute an individual and amasses evidence against him).

A more restrictive approach to standing, one that made conviction a prerequisite for any type of Cruel and Unusual Punishment Clause challenge, would allow the state to criminalize a protected behavior or condition and cite, arrest, jail, and even prosecute individuals for violations, so long as no conviction resulted. Under this approach, the state could in effect punish individuals in the preconviction stages of the criminal law enforcement process for being or doing things that under the Clause cannot be subject to the criminal pro-

cess. But the Clause's third protection limits the state's ability to criminalize certain behaviors or conditions, not merely its ability to convict and then punish post-conviction.

**[6]** Accordingly, to bring an as-applied challenge to a criminal statute alleged to transgress the Clause's substantive limits on criminalization, all that is required for standing is some direct injury—for example, a deprivation of property, such as a fine, or a deprivation of liberty, such as an arrest—resulting from the plaintiff's subjection to the criminal process due to violating the statute. *Cf. Lyons*, 461 U.S. at 101-02 (standing requires a direct injury). At least one other court hearing a challenge by homeless plaintiffs to municipal ordinances alleged to violate the Clause's substantive limits on criminalization has recognized this principle. *See Joyce*, 846 F. Supp. at 853-54 (noting that an attempt to read *Ingraham* to restrict Eighth Amendment standing to those convicted of crimes "is refuted by the express language of *Ingraham*," and holding that the fact that one of the plaintiffs had been cited and paid a fine "suffice[d] to invoke consideration of the Eighth Amendment"). Other courts likewise appear to have reached the merits of similar suits where homeless plaintiffs had not suffered convictions. *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994) (opinion suggests but does not state that plaintiffs had not suffered convictions); *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559-60 (S.D. Fla. 1992) (same), *remanded for limited purposes*, 40 F.3d 1155 (11th Cir. 1994).

Notwithstanding this well-established Supreme Court authority, the City urges us to follow the Fifth Circuit, which has based its rejection of an Eighth Amendment challenge by homeless persons on the absence of a conviction. *See Johnson v. City of Dallas*, 61 F.3d 442, 443-45 (5th Cir. 1995). There, the district court had found that there was insufficient shelter in Dallas and enjoined enforcement of an ordinance prohibiting sleeping in public against homeless individuals with no other place to be. *Johnson v. City of Dallas*, 860 F. Supp. 344,

350 (N.D. Tex. 1994), *rev'd on standing grounds*, 61 F.3d 442. Plaintiffs had been ticketed for violating the ordinance but none had been convicted. *Johnson*, 61 F.3d at 444. The Fifth Circuit reversed, reasoning that the very dicta from *Ingraham* that the City now relies on required a conviction for standing. *Id.* at 444-45. In focusing on this lack of a conviction, the Fifth Circuit, the City, and the dissent all fail to recognize the distinction between the Cruel and Unusual Punishment Clause's first two protections and its third. Moreover, they ignore the imminent threat of conviction and the evidence of actual convictions presented here.

[7] Although a conviction is not required to establish standing for prospective relief from enforcement of a criminal law against a status or behavior that may not be criminalized under the Eighth Amendment, here, two of the six Appellants, Purrie and Barger, have in fact been convicted and sentenced for violating section 41.18(d). Documents in the record demonstrate that judgment was pronounced and Barger was sentenced by the Los Angeles County Superior Court to time served on December 26, 2002. Similarly, judgment was pronounced and Purrie was given a twelve-month suspended sentence on January 15, 2003 with the condition that he "stay away from location of arrest."[4] If a conviction is constitution-

---

[4]The City belatedly objects to the dispositions attached to the Barger and Purrie declarations on foundational grounds. Having failed to assert its objections before the district court, the City has waived its objections as to the authenticity of the dispositions. *See, e.g.*, *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 n.5 (9th Cir. 2003).

In addition, the City and the dissent claim Appellants lack standing because they have failed to demonstrate that shelter was unavailable on the nights they were arrested or cited for violating section 41.18(d), and therefore cannot establish that they were punished for involuntary conduct. Because Appellants seek only prospective injunctive relief, standing depends on the likelihood of future injury, not the existence of past injury. Nevertheless, undisputed evidence in the record, including several reports directly authored or commissioned by City agencies or task forces, shows that there is a chronic and severe gap between the number of homeless

ally required, the fact that two of the six plaintiffs were convicted suffices to establish standing for all. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993), *as amended*. Thus the City's argument that Appellants lack standing because a conviction is required fails on the facts as well as the law.

The City next argues that Appellants lack standing because they could assert a necessity defense. In support of this argument, the City relies on *In re Eichorn*, 81 Cal. Rptr. 2d 535, 539-40 (Cal. Ct. App. 1998), in which the California Court of Appeal held that a homeless defendant may raise a necessity defense to violation of a municipal anti-camping ordinance. This argument also lacks merit.

**[8]** A criminal defendant may assert a necessity defense if he has committed an offense to prevent an imminent harm that he could not have otherwise prevented. *E.g.*, *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125 (9th Cir. 2001). Under California law, a court must instruct the jury on the necessity defense if there is

> evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency.

---

individuals and the number of available beds in Los Angeles. *E.g.*, L.A. Homeless Servs. Auth., *supra*, at 2-14 (in the County as a whole, there are almost 50,000 more homeless people than available beds). This evidence supports the reasonable inference that shelter is unavailable for thousands of homeless individuals in Los Angeles on any given night, including on the nights in question. Moreover, each of the declarations either expressly state that the declarant was unable to obtain shelter at the time they were cited or arrested, or provide sufficient facts from which a reasonable inference can be drawn that they were unable to do so.

*People v. Pepper*, 48 Cal. Rptr. 2d 877, 880 (Cal. Ct. App. 1996).

[9] It is undisputed, however, that Appellants have been and in the future will probably be fined, arrested, imprisoned, and/or prosecuted, as well as suffer the loss of their personal property, for involuntarily violating section 41.18(d). These preconviction harms, some of which occur immediately upon citation or arrest, suffice to establish standing and are not salved by the potential availability of a necessity defense. The loss of Appellants' possessions when they are arrested and held in custody is particularly injurious because they have so few resources and may find that everything they own has disappeared by the time they return to the street.

Moreover, the practical realities of homelessness make the necessity defense a false promise for those charged with violating section 41.18(d). Homeless individuals, who may suffer from mental illness, substance abuse problems, unemployment, and poverty, are unlikely to have the knowledge or resources to assert a necessity defense to a section 41.18(d) charge, much less to have access to counsel when they are arrested and arraigned. Furthermore, even counseled homeless individuals are unlikely to subject themselves to further jail time and a trial when they can plead guilty in return for a sentence of time served and immediate release. Finally, one must question the policy of arresting, jailing, and prosecuting individuals whom the City Attorney concedes cannot be convicted due to a necessity defense. If there is no offense for which the homeless can be convicted, is the City admitting that all that comes before is merely police harassment of a vulnerable population?

## B. The Eighth Amendment Prohibition on Cruel and Unusual Punishment

The district court erred by not engaging in a more thorough analysis of Eighth Amendment jurisprudence under *Robinson*

*v. California*, 370 U.S. 660 (1962), and *Powell v. Texas*, 392 U.S. 514 (1968), when it held that the only relevant inquiry is whether the ordinance at issue punishes status as opposed to conduct, and that homelessness is not a constitutionally cognizable status.

The district court relied exclusively on the analysis of *Robinson* and *Powell* by another district court in *Joyce v. City and County of San Francisco*, in which plaintiffs challenged certain aspects of San Francisco's comprehensive homelessness program on Eighth Amendment grounds. 846 F. Supp. 843 (N.D. Cal. 1994). *Joyce*, however, was based on a very different factual underpinning than is present here. Called the "Matrix Program," the homelessness program was " 'an interdepartmental effort . . . [utilizing] social workers and health workers . . . [and] offering shelter, medical care, information about services and general assistance.' " *Id.* at 847 (alterations and omissions in original). One element of the program consisted of the "Night Shelter Referral" program conducted by the Police Department, which handed out "referrals" to temporary shelters. *Id.* at 848. The City demonstrated that of 3,820 referral slips offered to men, only 1,866 were taken and only 678 used. *Id.*

The *Joyce* plaintiffs made only the conclusory allegation that there was insufficient shelter, *id.* at 849; they did not make the strong evidentiary showing of a substantial shortage of shelter Appellants make here. Moreover, the preliminary injunction plaintiffs sought in *Joyce* was so broad as to enjoin enforcement of prohibitions on camping or lodging in public parks and on " 'life-sustaining activities *such as* sleeping, sitting or remaining in a public place,' " which might also include such antisocial conduct as public urination and aggressive panhandling. *Id.* at 851 (emphasis added). Reasoning that plaintiffs' requested injunction was too broad and too difficult to enforce, and noting the preliminary nature of its findings based on the record at an early stage in the proceedings, the district court denied the injunction. *Id.* at 851-53.

The *Joyce* court also concluded that homelessness was not a status protectable under the Eighth Amendment, holding that it was merely a constitutionally noncognizable "condition." *Id.* at 857-58.

We disagree with the analysis of *Robinson* and *Powell* conducted by both the district court in *Joyce* and the district court in the case at bar. The City could not expressly criminalize the status of homelessness by making it a crime to be homeless without violating the Eighth Amendment, nor can it criminalize acts that are an integral aspect of that status. Because there is substantial and undisputed evidence that the number of homeless persons in Los Angeles far exceeds the number of available shelter beds at all times, including on the nights of their arrest or citation, Los Angeles has encroached upon Appellants' Eighth Amendment protections by criminalizing the unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless. A closer analysis of *Robinson* and *Powell* instructs that the involuntariness of the act or condition the City criminalizes is the critical factor delineating a constitutionally cognizable status, and incidental conduct which is integral to and an unavoidable result of that status, from acts or conditions that can be criminalized consistent with the Eighth Amendment.

Our analysis begins with *Robinson*, which announced limits on what the state can criminalize consistent with the Eighth Amendment. In *Robinson*, the Supreme Court considered whether a state may convict an individual for violating a statute making it a criminal offense to " 'be addicted to the use of narcotics.' " 370 U.S. at 660 (quoting Cal. Health & Safety Code § 11721). The trial judge had instructed the jury that

> "[t]o be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is chronic rather than acute; that it continues after it is complete and subjects the offender

> to arrest at any time before he reforms. . . . All that the People must show is . . . that while in the City of Los Angeles [Robinson] was addicted to the use of narcotics . . . ."

*Id.* at 662-63 (second alteration and third omission in original). The Supreme Court reversed Robinson's conviction, reasoning:

> It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. . . . [I]n the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

> We cannot but consider the statute before us as of the same category. In this Court counsel for the State recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment.

*Id.* at 666-67 (citation and footnotes omitted).

**[10]** The Court did not articulate the principles that undergird its holding. At a minimum, *Robinson* establishes that the state may not criminalize "being"; that is, the state may not punish a person for who he is, independent of anything he has done. *See, e.g.*, *Powell*, 392 U.S. at 533 (Marshall, J., plurality

opinion) (stating that *Robinson* requires an *actus reus* before the state may punish). However, as five Justices would later make clear in *Powell*, *Robinson* also supports the principle that the state cannot punish a person for certain conditions, either arising from his own acts or contracted involuntarily, or acts that he is powerless to avoid. *Powell*, 392 U.S. at 567 (Fortas, J., dissenting) (endorsing this reading of *Robinson*); *id.* at 550 n.2 (White, J., concurring in the judgment) (same, but only where acts predicate to the condition are remote in time); *see Robinson*, 370 U.S. at 666-67 (stating that punishing a person for having a venereal disease would be unconstitutional, and noting that drug addiction "may be contracted innocently or involuntarily").

Six years after its decision in *Robinson*, the Supreme Court considered the case of Leroy Powell, who had been charged with violating a Texas statute making it a crime to " 'get drunk or be found in a state of intoxication in any public place.' " *Powell*, 392 U.S. at 517 (Marshall, J., plurality opinion) (quoting Tex. Penal Code Ann. art. 477 (Vernon 1952)). The trial court found that Powell suffered from the disease of chronic alcoholism, which " 'destroys the afflicted person's will' " to resist drinking and leads him to appear drunk in public involuntarily. *Id.* at 521. Nevertheless, the trial court summarily rejected Powell's constitutional defense and found him guilty. *See id.* at 558 (Fortas, J., dissenting). On appeal to the United States Supreme Court, Powell argued that the Eighth Amendment prohibited "punish[ing] an ill person for conduct over which he has no control." Brief for Appellant at 6, *Powell*, 392 U.S. 514 (No. 405), 1967 WL 113841.

In a 4-1-4 decision, the Court affirmed Powell's conviction. The four Justices joining the plurality opinion interpreted *Robinson* to prohibit only the criminalization of pure status and not to limit the criminalization of conduct. *Powell*, 392 U.S. at 533 (Marshall, J., plurality opinion). The plurality then declined to extend the Cruel and Unusual Punishment Clause's protections to any involuntary conduct, citing slip-

pery slope concerns, *id.* at 534-35, and considerations of federalism and personal accountability, *id.* at 535-36. Because Powell was convicted not for his status as a chronic alcoholic, but rather for his acts of becoming intoxicated and appearing in public, the *Powell* plurality concluded that the Clause as interpreted by *Robinson* did not protect him. *Id.* at 532.

In contrast, the four Justices in dissent read *Robinson* to stand for the proposition that "[c]riminal penalties may not be inflicted on a person for being in a condition he is powerless to change." *Id.* at 567 (Fortas, J., dissenting). Applying *Robinson* to the facts of Powell's case, the dissenters first described the predicate for Powell's conviction as "the mere *condition* of being intoxicated in public" rather than any "*acts*," such as getting drunk and appearing in public. *Id.* at 559. Next and more significantly, the dissenters addressed the involuntariness of Powell's behavior, noting that Powell had " 'an uncontrollable compulsion to drink' to the point of intoxication; and that, once intoxicated, he could not prevent himself from appearing in public places." *Id.* at 568. Having found that the Cruel and Unusual Punishment Clause, as interpreted by *Robinson*, protects against the criminalization of being in a condition one is powerless to avoid, *see id.* at 567, and because Powell was powerless to avoid public drunkenness, the dissenters concluded that his conviction should be reversed, *see id.* at 569-70.

In his separate opinion, Justice White rejected the plurality's proposed status-conduct distinction, finding it similar to "forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion." *Id.* at 548-49 (White, J., concurring in the judgment). Justice White read *Robinson* to stand for the principle that "it cannot be a crime to have an irresistible compulsion to use narcotics," *id.* at 548, and concluded that "[t]he proper subject of inquiry is whether volitional acts [sufficiently proximate to the condition] brought about the" criminalized conduct or condition, *id.* at 550 n.2.

Justice White concluded that given the holding in *Robinson*, "the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or being drunk." *Id.* at 549. For those chronic alcoholics who lack homes,

> a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment—the act of getting drunk.

*Id.* at 551. This position is consistent with that of the *Powell* dissenters, who quoted and agreed with Justice White's standard, *see id.* at 568 n.31 (Fortas, J., dissenting), and stated that Powell's conviction should be reversed because his public drunkenness was involuntary, *id.* at 570.

Justice White's *Powell* opinion also echoes his prior dissent in *Robinson*. In *Robinson*, Justice White found no Eighth Amendment violation for two reasons: First, because he did "not consider [Robinson's] conviction to be a punishment for having an illness or for simply being in some status or condition, but rather a conviction for the regular, repeated or habitual use of narcotics immediately prior to his arrest," *Robinson*, 370 U.S. at 686 & nn.2-3 (White, J., dissenting) (discussing jury instructions regarding addiction and substantial evidence of Robinson's frequent narcotics use in the days prior to his arrest); and second, and most importantly for understanding his opinion in *Powell*, because the record did not suggest that Robinson's drug addiction was involuntary, *see id.* at 685. According to Justice White, "if [Robinson] was convicted for being an addict who had lost his power of self-control, I would have other thoughts about this case." *Id.*

Justice White and the *Powell* dissenters shared a common view of the importance of involuntariness to the Eighth

Amendment inquiry. They differed only on two issues. First, unlike the dissenters, Justice White believed Powell had not demonstrated that his public drunkenness was involuntary. *Compare Powell*, 392 U.S. at 553 (White, J., concurring in the judgment) ("[N]othing in the record indicates that [Powell] could not have done his drinking in private . . . . Powell had a home and wife, and if there were reasons why he had to drink in public or be drunk there, they do not appear in the record."), *with id.* at 568 n.31 (Fortas, J., dissenting) ("I believe these findings must fairly be read to encompass facts that my Brother White agrees would require reversal, that is, that for appellant Powell, 'resisting drunkenness' and 'avoiding public places when intoxicated' on the occasion in question were 'impossible.' ").

Second, Justice White rejected the dissent's attempt to distinguish conditions from acts for Eighth Amendment purposes. *See id.* at 550 n.2 (White, J., concurring in the judgment). We agree with Justice White that analysis of the Eighth Amendment's substantive limits on criminalization "is not advanced by preoccupation with the label 'condition.' " *Id.* One could define many acts as being in the condition of engaging in those acts, for example, the act of sleeping on the sidewalk is indistinguishable from the condition of being asleep on the sidewalk. " 'Being' drunk in public is not far removed in time from the acts of 'getting' drunk and 'going' into public," and there is no meaningful "line between the man who appears in public drunk and that same man five minutes later who is then 'being' drunk in public." *Id.* The dissenters themselves undermine their proposed distinction by suggesting that criminalizing involuntary acts that "typically flow from . . . the disease of chronic alcoholism" would violate the Eighth Amendment, as well as by stating that "[i]f an alcoholic should be convicted for criminal conduct which is *not* a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment." *Id.* at 559 n.2 (Fortas, J., dissenting) (emphasis added).

**[11]** Notwithstanding these differences, five Justices in *Powell* understood *Robinson* to stand for the proposition that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being. *See id.* at 548, 550 n.2, 551 (White, J., concurring in the judgment); *id.* at 567 (Fortas, J., dissenting); *see also* Robert L. Misner, *The New Attempt Laws: Unsuspected Threat to the Fourth Amendment*, 33 Stan. L. Rev. 201, 219 (1981) ("[T]he consensus [of White and the dissenters apparently] was that an involuntary act does not suffice for criminal liability."). Although this principle did not determine the outcome in *Powell*, it garnered the considered support of a majority of the Court. Because the conclusion that certain involuntary acts could not be criminalized was not dicta, *see United States v. Johnson*, 256 F.3d 895, 915, 914-16 (9th Cir. 2001) (en banc) (Kozinski, J., concurring) (narrowly defining dicta as "a statement [that] is made casually and without analysis, . . . uttered in passing without due consideration of the alternatives, or . . . merely a prelude to another legal issue that commands" the court's full attention), we adopt this interpretation of *Robinson* and the Cruel and Unusual Punishment Clause as persuasive authority. We also note that in the absence of any agreement between Justice White and the plurality on the meaning of *Robinson* and the commands of the Cruel and Unusual Punishment Clause, the precedential value of the *Powell* plurality opinion is limited to its precise facts. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." *Marks v. United States*, 430 U.S. 188, 193 (1977) (omission in original) (internal quotation marks omitted); *see also* Kent Greenawalt, *"Uncontrollable" Actions and the Eighth Amendment: Implications of* Powell v. Texas, 69 Colum. L. Rev. 927, 931 (1969) ("[T]he dissent comes closer to speaking for a majority of the Court than does the plurality opinion.").

**[12]** Following *Robinson*'s holding that the state cannot criminalize pure status, and the agreement of five Justices in *Powell* that the state cannot criminalize certain involuntary conduct, there are two considerations relevant to defining the Cruel and Unusual Punishment Clause's limits on the state's power to criminalize. The first is the distinction between pure status—the state of being—and pure conduct—the act of doing. The second is the distinction between an involuntary act or condition and a voluntary one. Accordingly, in determining whether the state may punish a particular involuntary act or condition, we are guided by Justice White's admonition that "[t]he proper subject of inquiry is whether volitional acts brought about the 'condition' and whether those acts are sufficiently proximate to the 'condition' for it to be permissible to impose penal sanctions on the 'condition.' " *Powell*, 392 U.S. at 550 n.2 (White, J., concurring in the judgment); *see also Bowers v. Hardwick*, 478 U.S. 186, 202 n.2 (1986) (Blackmun, J., dissenting) (quoting and endorsing this statement in discussing whether the Eighth Amendment limits the state's ability to criminalize homosexual acts).

**[13]** The *Robinson* and *Powell* decisions, read together, compel us to conclude that enforcement of section 41.18(d) at all times and in all places against homeless individuals who are sitting, lying, or sleeping in Los Angeles's Skid Row because they cannot obtain shelter violates the Cruel and Unusual Punishment Clause. As homeless individuals, Appellants are in a chronic state that may have been acquired "innocently or involuntarily." *Robinson*, 370 U.S. at 667. Whether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human. It is undisputed that, for homeless individuals in Skid Row who have no access to private spaces, these acts can only be done in public. In contrast to Leroy Powell, Appellants have made a substantial showing that they are "unable to stay off the streets on the night[s] in question." *Powell*, 392 U.S. at 554 (White, J., concurring in the judgment).

In disputing our holding, the dissent veers off track by attempting to isolate the supposed "criminal conduct" from the status of being involuntarily homeless at night on the streets of Skid Row. Unlike the cases the dissent relies on, which involve failure to carry immigration documents, illegal reentry, and drug dealing, the conduct at issue here is involuntary and inseparable from status—they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping. The cases the dissent cites do not control our reading of *Powell* and *Robinson* where, as here, an Eighth Amendment challenge concerns the *involuntariness* of a criminalized act or condition inseparable from status. *See Johnson*, 256 F.3d at 915 ("Where it is clear that a statement . . . is uttered in passing without due consideration of the alternatives, . . . it may be appropriate to re-visit the issue in a later case."). The City and the dissent apparently believe that Appellants can avoid sitting, lying, and sleeping for days, weeks, or months at a time to comply with the City's ordinance, as if human beings could remain in perpetual motion. That being an impossibility, by criminalizing sitting, lying, and sleeping, the City is in fact criminalizing Appellants' status as homeless individuals.

Similarly, applying *Robinson* and *Powell*, courts have found statutes criminalizing the status of vagrancy to be unconstitutional. For example, *Goldman v. Knecht* declared unconstitutional a Colorado statute making it a crime for " '[a]ny person able to work and support himself' " to " 'be found loitering or strolling about, frequenting public places, . . . begging or leading an idle, immoral or profligate course of life, or not having any visible means of support.' " 295 F. Supp. 897, 899 n.2, 908 (D. Colo. 1969) (three-judge court); *see also Wheeler v. Goodman*, 306 F. Supp. 58, 59 n.1, 62, 66 (W.D.N.C. 1969) (three-judge court) (striking down as unconstitutional under *Robinson* a statute making it a crime to, *inter alia*, be able to work but have no property or " 'visible and known means' " of earning a livelihood), *vacated on other grounds*, 401 U.S. 987 (1971). These cases establish that the

state may not make it an offense to be idle, indigent, or homeless in public places. Nor may the state criminalize conduct that is an unavoidable consequence of being homeless—namely sitting, lying, or sleeping on the streets of Los Angeles's Skid Row. As Justice White stated in *Powell*, "[p]unishing an addict for using drugs convicts for addiction under a different name." 392 U.S. at 548 (White, J., concurring in the judgment).

## IV.   Conclusion

Homelessness is not an innate or immutable characteristic, nor is it a disease, such as drug addiction or alcoholism. But generally one cannot become a drug addict or alcoholic, as those terms are commonly used, without engaging in at least some voluntary acts (taking drugs, drinking alcohol). Similarly, an individual may become homeless based on factors both within and beyond his immediate control, especially in consideration of the composition of the homeless as a group: the mentally ill, addicts, victims of domestic violence, the unemployed, and the unemployable. That Appellants may obtain shelter on some nights and may eventually escape from homelessness does not render their status at the time of arrest any less worthy of protection than a drug addict's or an alcoholic's.

Undisputed evidence in the record establishes that at the time they were cited or arrested, Appellants had no choice other than to be on the streets. Even if Appellants' past volitional acts contributed to their current need to sit, lie, and sleep on public sidewalks at night, those acts are not sufficiently proximate to the conduct at issue here for the imposition of penal sanctions to be permissible. *See Powell v. Texas*, 392 U.S. 514, 550 n.2 (1968) (White, J., concurring in the judgment). In contrast, we find no Eighth Amendment protection for conduct that a person makes unavoidable based on their own immediately proximate voluntary acts, for example,

driving while drunk, harassing others, or camping or building shelters that interfere with pedestrian or automobile traffic.

Our holding is a limited one. We do not hold that the Eighth Amendment includes a *mens rea* requirement, or that it prevents the state from criminalizing conduct that is not an unavoidable consequence of being homeless, such as panhandling or obstructing public thoroughfares. *Cf. United States v. Black*, 116 F.3d 198, 201 (7th Cir. 1997) (rejecting convicted pedophile's Eighth Amendment challenge to his prosecution for receiving, distributing, and possessing child pornography because, *inter alia*, defendant "did not show that [the] charged conduct was involuntary or uncontrollable").

We are not confronted here with a facial challenge to a statute, *cf. Roulette v. City of Seattle*, 97 F.3d 300, 302 (9th Cir. 1996) (rejecting a facial challenge to a municipal ordinance that prohibited sitting or lying on public sidewalks); *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1080 (1995) (finding a municipal ordinance that banned camping in designated public areas to be facially valid); nor a statute that criminalizes public drunkenness or camping, *cf. Joyce v. City and County of San Francisco*, 846 F. Supp. 843, 846 (N.D. Cal. 1994) (program at issue targeted public drunkenness and camping in public parks); or sitting, lying, or sleeping only at certain times or in certain places within the city. And we are not called upon to decide the constitutionality of punishment when there are beds available for the homeless in shelters. *Cf. Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) (affirming summary judgment for the City where "[t]he shelter has never reached its maximum capacity and no individual has been turned away for lack of space or for inability to pay the one dollar fee").

We hold only that, just as the Eighth Amendment prohibits the infliction of criminal punishment on an individual for being a drug addict, *Robinson*, 370 U.S. at 667; or for involuntary public drunkenness that is an unavoidable consequence

of being a chronic alcoholic without a home, *Powell*, 392 U.S. at 551 (White, J., concurring in the judgment); *id.* at 568 n.31 (Fortas, J., dissenting); the Eighth Amendment prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter in the City of Los Angeles.

**[14]** We do not suggest that Los Angeles adopt any particular social policy, plan, or law to care for the homeless. *See Johnson v. City of Dallas*, 860 F. Supp. 344, 350-51 (N.D. Tex. 1994), *rev'd on standing grounds*, 61 F.3d 442 (5th Cir. 1995). We do not desire to encroach on the legislative and executive functions reserved to the City Council and the Mayor of Los Angeles. There is obviously a "homeless problem" in the City of Los Angeles, which the City is free to address in any way that it sees fit, consistent with the constitutional principles we have articulated. *See id.* By our decision, we in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets of Los Angeles at any time and at any place within the City. All we hold is that, so long as there is a greater number of homeless individuals in Los Angeles than the number of available beds, the City may not enforce section 41.18(d) at all times and places throughout the City against homeless individuals for involuntarily sitting, lying, and sleeping in public. Appellants are entitled at a minimum to a narrowly tailored injunction against the City's enforcement of section 41.18(d) at certain times and/or places.

**[15]** We reverse the award of summary judgment to the City, grant summary judgment to Appellants, and remand to the district court for a determination of injunctive relief consistent with this opinion.

**REVERSED AND REMANDED.**

RYMER, Circuit Judge, dissenting:

There is no question that homelessness is a serious problem and the plight of the homeless, a cause for serious concern. Yet this does not give us license to expand the narrow limits that, in a "rare type of case," the Cruel and Unusual Punishment Clause of the Eighth Amendment places on substantive criminal law. The majority sees it differently, concluding that the Eighth Amendment forbids the City of Los Angeles from enforcing an ordinance which makes it unlawful to sit, sleep, or lie on sidewalks. It gets there by cobbling together the views of dissenting and concurring justices, creating a circuit conflict on standing, and overlooking both Supreme Court precedent, and our own, that restrict the substantive component of the Eighth Amendment to crimes not involving an act. I disagree, and therefore dissent, for a number of reasons.

Los Angeles Municipal Code (LAMC) § 41.18(d) does not punish people simply because they are homeless. It targets *conduct* — sitting, lying or sleeping on city sidewalks — that can be committed by those with homes as well as those without. Although the Supreme Court recognized in *Robinson v. California*, 370 U.S. 660 (1962), that there are substantive limits on what may be made criminal and punished as such, both the Court and we have constrained this category of Eighth Amendment violation to persons who are being punished for crimes that do not involve *conduct* that society has an interest in preventing. *See, e.g.*, *Powell v. Texas*, 392 U.S. 514, 531-33 (1968) (Marshall, J., plurality); *United States v. Ayala*, 35 F.3d 423, 426 (9th Cir. 1994).

Neither the Supreme Court nor any other circuit court of appeals has ever held that conduct derivative of a status may not be criminalized. The majority relies on the dissenting opinions and dicta in the concurring opinion in *Powell* (which involved a conviction for public drunkenness of an alcoholic who was to some degree compelled to drink), but not even the *Powell* dissent would go so far as to hold that conduct which

is closely related to status may not constitutionally be pun-ished unless the conduct is "a characteristic and involuntary part of the pattern of the [status] as it afflicts" the particular individual. 392 U.S. at 559, n.2 (Fortas, J., dissenting). This is not the case with a homeless person who sometimes has shelter and sometimes doesn't.

Nor, until now, has the Supreme Court or any other circuit court of appeals intimated (let alone held) that status plus a condition which exists on account of discretionary action by someone else is the kind of "involuntary" condition that can-not be criminalized. Here, the majority holds that the Eighth Amendment "prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless with-out shelter in the City of Los Angeles." Maj. op. at 4454. In other words, the City cannot penalize the status of being homeless plus the condition of being without shelter that exists by virtue of the City's failure to provide sufficient housing on any given night. The ramifications of so holding are quite extraordinary. We do not — and should not — immunize from criminal liability those who commit an act as a result of a condition that the government's failure to provide a benefit has left them in.

Regardless, the challenge should fail even on the majority's view of the law because Jones has not shown that he was accused of being in an involuntary condition which he had no capacity to change or avoid. The attack on LAMC § 41.18(d) is not facial; it is as applied to Jones and those who join him in this suit. Jones's theory (embraced by the majority) is that the City's failure to supply adequate shelter caused the six persons who pursue this action to commit the prohibited act, that is, the act of sleeping, sitting or lying on the streets. How-ever, there is no showing in this case that shelter was unavail-able on the night that any of the six was apprehended. This is not a class action; each of the six must have been injured in fact by enforcement of the ordinance. As no one has made

that showing, the claimants both lack standing and lose on the merits. If Jones were not on the streets because he couldn't find shelter, his conviction cannot have offended the Constitution no matter how broadly the Eighth Amendment is construed.

Finally, Eighth Amendment protections apply to those who are convicted, not to those who are arrested. Even assuming that at least one of the six homeless persons in this action has been convicted and will be prosecuted again, there is no basis for supposing that he will be *convicted* again. California law provides a defense to conviction under an ordinance such as Los Angeles's if the homeless person shows that he slept, lay or sat on the streets because of economic forces or inadequate alternatives. *See In re Eichorn*, 69 Cal. App. 4th 382, 389-91 (1998). Thus, it cannot be said that any of the six will be subject to punishment for purposes of the Eighth Amendment on account of any involuntary condition. They both lack standing, and lose on the merits, for this reason as well.

Accordingly, I part company with the majority's expansive construction of the substantive limits on criminality. It exceeds the boundaries set by the Supreme Court on the *Robinson* limitation, and intrudes into the state's province to determine the scope of criminal responsibility. I would affirm.

I

Edward Jones and his wife are homeless. Their monthly general relief check is not sufficient to pay for a hotel room on Skid Row for the entire month. No shelter permits a childless couple to stay together. Jones has been cited, but not arrested or convicted, for sleeping on the streets in violation of LAMC § 41.18(d).

Robert Lee Purrie has tried to find shelter in Skid Row and been told that there are no beds available. He was cited for violating LAMC § 41.18(d) but failed to appear, which appar-

ently led to a warrant being issued for his arrest. He was arrested pursuant to the warrant and also charged with violating the ordinance. Purrie states that he was given a suspended sentence on condition that he stay away from the place he was arrested. There is no record of conviction, or any evidence that Purrie was turned away from a shelter the night he was cited.

Patricia and George Vinson have tried to rent rooms in Skid Row hotels and to get into various shelters, but have been unable to find a facility with space they can afford that will allow them to stay together. When they lack money for a motel room, they take the bus to a shelter in South Los Angeles. Occasionally they miss the bus and are forced to sleep on the street. They were cited on one of these occasions, but not arrested or convicted, for violating LAMC § 41.18(d).

Thomas Cash is homeless and disabled. He was residing in a facility on Skid Row provided through the County's cold-weather voucher program when he was cited for sitting on the sidewalk.

Stanley Barger also is homeless and disabled. He can afford to stay in a hotel for only a few days a month on his general relief allowance; his social security income was cut off when he was arrested for consuming alcohol in violation of his parole terms. He was arrested for sleeping on the street and also on an outstanding warrant. He states he was sentenced to time served, but does not say on which charge. There is no record of conviction.

Jones claims that some 42,000 people are homeless each night in the City of Los Angeles, with approximately 11,000 living in the Skid Row area. The number of homeless persons exceeds the number of available shelter beds. Of the 11,000 on Skid Row, approximately 7,000 sleep in a single-room occupancy facility and 2,000 stay in emergency shelter facili-

ties. On any given night, this leaves 2,000 people without shelter.

Jones seeks to enjoin enforcement of LAMC § 41.18(d) between the hours of 9:00 p.m. and 6:30 a.m. The parties brought cross-motions for summary judgment. The district court rejected Jones's contention that the failure of the City to provide sufficient housing compels the conclusion that homelessness is cognizable as a status. It agreed with Judge Jensen's analysis in *Joyce v. City and County of San Francisco*, 846 F. Supp. 843 (N.D. Cal. 1994), that status cannot be defined as a function of the discretionary acts of others, and held that even if homelessness were considered a status, criminalizing the acts of sitting, lying, or sleeping on the streets would not be a cognizable violation of the Eighth Amendment. Accordingly, the court granted the City's motion for summary judgment.

II

The City asserts for the first time on appeal that the homeless persons who pursue this Eighth Amendment action lack standing because they were never convicted of violating the ordinance. It points to *Johnson v. City of Dallas*, 61 F.3d 442 (5th Cir. 1995), where the court held that homeless persons who sought to enjoin enforcement of a Dallas ordinance prohibiting sleeping in public had no standing as none had been convicted, and to *Davison v. City of Tucson*, 924 F. Supp. 989, 993 (D. Ariz. 1996), which similarly held that homeless persons challenging a city resolution to remove them from a location where they had camped lacked standing because "the Eighth Amendment protection against cruel and unusual punishment can only be invoked by persons convicted of crimes." I agree with the City that our jurisdiction is implicated, and I disagree with the majority that we should be persuaded to reach the merits by *Joyce*, 846 F. Supp. at 854, or by cases where the court did not even address the question whether there had been convictions. *Joyce* was a class action in which

the plaintiffs alleged injuries to individuals in the putative class that included convictions of "camping"-related offenses, and neither *Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994)*,* nor *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559-60 (S.D. Fla. 1992), states one way or the other whether plaintiffs had been convicted. I also disagree with the majority's conclusion that "all that is required for standing is some direct injury — for example, a deprivation of property, such as a fine, or liberty, such as an arrest — based on the plaintiff's violation of the statute," maj. op. at 4438, because this is an action arising under the *Eighth Amendment*, where injury comes from cruel and unusual punishment — *not* under the Due Process Clause, where injury comes from deprivation of a liberty or property interest without due process. Nevertheless, in a case such as this the standing inquiry essentially collapses into the merits, so instead of treating the issue separately as I normally would, I will simply explain why, in my view, there is no basis upon which Jones is entitled to relief.[1]

## III

Jones argues that LAMC § 41.18(d) makes criminal what biology and circumstance make necessary, that is, sitting, lying, and sleeping on the streets. He maintains that the gap between the number of homeless persons in Los Angeles, and the number of available shelter beds, leaves thousands without shelter every night. Jones claims that the situation is particularly acute on Skid Row, where most homeless shelters and services have been centralized. As Jones puts it, so long as there are more homeless people than shelter beds, "the

---

[1]It would appear that at least Purrie and Barger raise a triable issue that they were convicted of violating LAMC § 41.18(d) and fear conviction in the future. While this might satisfy the Fifth Circuit's *Johnson* test, it does not necessarily save their standing to the extent they challenge the ordinance based on being convicted for the involuntary "condition" of being on the streets without available shelter. This is because there is no evidence that shelter was unavailable when they committed the underlying offense of sitting, sleeping or lying on City sidewalks.

nightly search for shelter will remain a zero-sum game in which many of the homeless, through no fault of their own, will end up breaking the law." By enforcing the ordinance, Jones contends, the City subjects homeless persons to a cycle of citation, arrest, and punishment for the involuntary and harmless conduct of sitting or lying in the street. Accordingly, he seeks to bring the ordinance "in line with less draconian ordinances in other cities" by barring its enforcement in Skid Row during nighttime hours.

Jones relies on *Robinson v. California*, 370 U.S. 660 (1962), to argue that persons cannot be punished for their status alone. In *Robinson*, the Court reversed the conviction of a drug addict who had been convicted of violating a California statute that made it a criminal offense for a person to "be addicted to the use of narcotics." The Court observed of this statute, that it

> is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the "status" of narcotic addiction a criminal offense, for which the offender may be prosecuted "at any time before he reforms." California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there.

*Id*. at 666. The Court noted that narcotic addiction was "an illness which may be contracted innocently or involuntarily," and held that "a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular

behavior there, inflicts a cruel and unusual punishment . . . ." *Id.* at 667.

Jones submits that as the City could not expressly criminalize the status of being homeless without offending the Eighth Amendment, it cannot enforce the ordinance when the number of homeless persons exceeds the number of available shelter beds because to do so has the *effect* of criminalizing homelessness. For this he relies on *Pottinger v. City of Miami*, 810 F. Supp. 1551 (S.D. Fla. 1992). *Pottinger* was a class action on behalf of 6,000 homeless people living in Miami who alleged that arrests for sleeping or bathing in public, and destruction of their property, violated their rights under the Eighth Amendment. The court held that arresting homeless individuals for harmless, involuntary conduct is cruel and unusual punishment and a violation of their due process rights. Based on the record adduced in that case, it found that being homeless is rarely a choice; it also found that the homeless plaintiffs lacked any place where they could lawfully be and had no realistic choice but to live in public places because of the unavailability of low-income housing or alternative shelter. In this sense, the court believed that their conduct was involuntary and that being arrested effectively punishes the homeless for being homeless. However, in my view, *Pottinger*'s extension of the Eighth Amendment to conduct that is derivative of status takes the substantive limits on criminality further than *Robinson* or its progeny support. *See Joyce*, 846 F. Supp. at 856-58 (rejecting *Pottinger*'s rationale as a dubious application of *Robinson* and *Powell* as well as principles of federalism).

In *Powell v. Texas*, 392 U.S. 514 (1968), the successor case to *Robinson*, the Court affirmed a conviction for being found in a state of intoxication in a public place in violation of state law. Justice Marshall's plurality opinion rejected Powell's reliance on *Robinson* because Powell was not convicted for being a chronic alcoholic but for being in public while drunk on a particular occasion. As he explained:

> *Robinson* so viewed brings this Court but a very small way into the substantive criminal law. And unless *Robinson* is so viewed it is difficult to see any limiting principle that would serve to prevent this Court from becoming, under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility, in diverse areas of the criminal law, throughout the country.

*Id*. at 533 (Marshall, J., plurality). The plurality also rejected the dissent's interpretation of *Robinson* — adopted by Jones and the majority here — as precluding the imposition of criminal penalties upon a person for being in a condition he is powerless to change. Rather,

> [t]he entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some actus reus. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, "involuntary" or "occasioned by a compulsion."

*Id*. at 533.

Justice White concurred in the judgment. In his view, if it could not be a crime to have an "irresistible compulsion to use narcotics" in *Robinson*, then the use of narcotics by an addict must be beyond the reach of the criminal law. *Id*. at 548-49 (White, J., concurring in the result). From this it followed to Justice White that the statute under which Powell was convicted should not be applied to a chronic alcoholic who has a compulsion to drink and nowhere but a public place in which to do so. "As applied to [such alcoholics] this statute is in effect a law which bans a single act for which they may

not be convicted under the Eighth Amendment — the act of getting drunk." *Id.* at 551. However, Justice White did not believe the conviction offended the Constitution because Powell made no showing that he was unable to stay off the streets on the night he was arrested. *Id.* at 552-53.

The *Powell* dissent opined that a criminal penalty could not be imposed on a person suffering the disease of chronic alcoholism for a condition — being in a state of intoxication in public — which is a characteristic part of the pattern of his disease. *Id.* at 559 (Fortas, J., dissenting). Contrary to the plurality, the dissent read *Robinson* as standing on the principle that "[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." *Id.* at 567. Noting that the statute in *Powell* differed from the statute in *Robinson* by covering more than mere status (being intoxicated and being found in a public place while in that condition), the dissent nevertheless found the same constitutional defect present as in both cases, the defendant was accused of being "in a condition which he had no capacity to change or avoid." *Id.* at 567-68.

Finally, the Court commented on the purpose of the Cruel and Unusual Punishment Clause, and on *Robinson*, in *Ingraham v. Wright*, 430 U.S. 651 (1977). *Ingraham* involved the use of corporal punishment of students in a public school. "An examination of the history of the Amendment and the decisions of this Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes." *Id.* at 664; *see also Graham v. Connor*, 490 U.S. 386, 392 & n.6 (1989) (noting that Judge Friendly's view that Eighth Amendment protections do not attach until after conviction and sentence "was confirmed by *Ingraham*"). Put differently, "[t]he primary purpose of [the clause] has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes. . . ." *Ingraham*, 430 U.S. at 667 (quoting *Powell*, 392 U.S. at 531-32 (Marshall, J., plurality)).

After surveying its "cruel and unusual punishment" jurisprudence, the Court remarked that

> these decisions recognize that the Cruel and Unusual Punishments Clause circumscribes the criminal process in three ways. First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such.

*Id.* at 667 (citations omitted). Of the last, or *Robinson*, limitation, the Court stated: "We have recognized the last limitation as one to be applied sparingly." *Id.* (referring to *Powell*, 393 U.S. at 531-32).

Our court has considered whether individuals are being punished on account of status rather than conduct several times. In *United States v. Ritter*, 752 F.2d 435 (1985), the defendant was convicted of possession of cocaine with intent to distribute. He was stopped at a border checkpoint but was not carrying immigration documents. *Id.* at 436. This led to a search that uncovered drugs, and to a motion to suppress that challenged the constitutionality of a federal statute making it a criminal offense for documented aliens to fail to carry documents. Ritter argued that requiring documents to check his status offended the Eighth Amendment's substantive limits on what can be made criminal. *Id.* at 437. Citing *Robinson* as an example of "the rare type of case in which the clause has been used to limit what may be made criminal," we held that the statute at issue in *Ritter* did not come with the purview of "this unusual sort of case." *Id*. In doing so, we emphasized the Supreme Court's admonition that "this particular use of the clause is to be applied sparingly," and reiterated that "[t]he primary purpose of the clause is directed at the method or kind of punishment imposed for a criminal violation." *Id.* at 438 (citing *Ingraham*, 430 U.S. at 667).

In *United States v. Kidder*, 869 F.2d 1328 (9th Cir. 1989), a defendant convicted of possession of cocaine with intent to distribute argued that he was being unconstitutionally punished because of his status as a mentally ill drug addict. We understood his contention to be that his involvement was caused by mental illness, so to imprison him for drug dealing was tantamount to punishing him for being mentally ill. *Id.* at 1331-32. We concluded that because the statute under which he was convicted punishes a person for the *act* of possessing illegal drugs with intent to distribute, it does not run afoul of *Robinson*. *Id.* at 1332. Kidder also argued that even if he were being punished for his acts rather than his status, the involuntary nature of the acts rendered them immune from criminal punishment. *Id.* We recognized that this issue was raised in *Powell* but no majority opinion emerged; however, we declined to decide it because Kidder's guilty plea waived any argument that his actions were involuntary.[2] *Id.* at 1332-33.

And in *United States v. Ayala*, 35 F.3d 423 (9th Cir. 1994), the defendant was convicted of illegal re-entry in the United States without permission and within five years of being deported. Relying on *Robinson*, he argued that the "found in" provision of 28 U.S.C. § 1326 impermissibly punished him for the "status" of being found in the United States. *Id.* at 425. We thought the reliance misplaced, noting that the "Supreme Court has subsequently limited the applicability of *Robinson* to crimes that do not involve an actus reus." *Id.* at 426 (citing *Powell*, 392 U.S. at 533 (Marshall, J., plurality)). As a conviction for being "found in" the United States necessarily requires that a defendant commit the act of re-entering the country without permission within five years of being deported, there was no Eighth Amendment problem.

---

[2]In this connection, we noted that "[t]he proper procedure to raise this sort of claim would have been for Kidder to have pleaded not guilty and then to challenge the constitutionality of the [statute]. Having pleaded guilty, however, Kidder may not now claim that his actions were really involuntary and thus not constitutionally susceptible to punishment." *Kidder*, 869 F.2d at 1333.

These cases indicate to me that application of LAMC § 41.18(d) to Jones's situation is not the "rare type of case" for which the Cruel and Unusual Punishment Clause limits what may be criminalized. *Robinson* does not apply to criminalization of conduct. Its rationale is that the California statute penalizing addiction *failed* to criminalize conduct, and this failure is what made it unconstitutional. 370 U.S. at 666 ("This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration."). The plurality in *Powell* interpreted *Robinson* this way, and in a view that is binding on us now, we previously adopted the plurality's position as controlling by stating in *Ayala* that "[t]he Supreme Court has subsequently limited the applicability of *Robinson* to crimes that do not involve an actus reus." *Ayala*, 35 F.3d at 426 (citing *Powell*, 392 U.S. at 533 (Marshall, J., plurality)); *see also United States v. Parga-Rosas*, 238 F.3d 1209, 1212 (9th Cir. 2001) (noting that the point of *Powell* and *Ayala* is that criminal penalties can be imposed only if the accused "has committed some actus reus"). As the offense here is the *act* of sleeping, lying or sitting on City streets, *Robinson* does not apply.[3]

Also, in the rare case exemplified by *Robinson*, the status being criminalized is an *internal* affliction, potentially an innocent or involuntary one. *See Robinson*, 370 U.S. at 665-67 (equating a statute that makes the status of addiction criminal with making it a crime for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease, and noting

---

[3]Neither of the two 1969 district court opinions cited by the majority, maj. op. at 4451, in support of the proposition that the Eighth Amendment forbids criminalizing conduct derivative of status, *Goldman v. Knecht*, 295 F. Supp. 897 (D. Colo. 1969); *Wheeler v. Goodman*, 306 F. Supp. 58 (W.D.N.C. 1969), *vacated on other grounds by* 401 U.S. 987 (1971), is to the contrary. In fact, in both cases the court struck down the statute at issue for criminalizing status, not conduct, explicitly recognizing that there would have been no trouble had the statutes instead criminalized conduct. *Goldman*, 295 F. Supp. at 908; *Wheeler*, 306 F. Supp. at 64.

that addiction is an illness that "may be contracted innocently or involuntarily"). Although the majority acknowledges that homelessness is neither a disease nor an innate or immutable characteristic, maj. op. at 4452, it nevertheless holds that Jones, as a homeless individual, is "in a chronic state that may have been 'contracted innocently or involuntarily.' " *Id.* at 4450. Being homeless, however, is a transitory state. Some people fall into it, others opt into it. For many, including the homeless persons who pursue this action, it is a status that fluctuates on a daily basis and can change depending upon income and opportunities for shelter. Many are able to escape it altogether. *See* U.S. Conf. of Mayors, *A Status Report on Hunger and Homelessness in America's Cities 2002* at 312 (indicating that "people remain homeless an average of six months in survey cities").[4] In addition, the justices in *Powell* who were troubled by the statute at issue there, which made it a crime to be found intoxicated in public, thought it was problematic because a chronic alcoholic has a compulsion to drink wherever he is. *See Powell*, 392 U.S. at 549 (White, J., concurring) (noting that resisting drunkenness and avoiding public places when intoxicated may be impossible for some); *id.* at 568 (Fortas, J., dissenting) (noting that like the addict in *Robinson*, an alcoholic is powerless to avoid drinking to the point of intoxication and once intoxicated, to prevent himself from appearing in public places).

In further contrast to *Robinson*, where the Court noted that California through its statute "said that a person can be con-

___

[4]This is the only study in the record (others referred to by the majority are not), and it does not indicate that Los Angeles was among the cities surveyed. However, there is no reason to believe that the statistics aren't applicable to Los Angeles as well. *See, e.g.*, Daniel Flaming, et al., *Homeless in LA: Final Research Report for the 10-Year Plan to End Homelessness in Los Angeles County* at 72 (Sept. 2004) (finding that in a given year in Los Angeles less than ten percent of the homeless population remained homeless for more than six months), *available at* http://www.bringlahome.org/docs/HILA_Final.PDF. (This study is not part of the record, either.)

tinuously guilty of this offense [being addicted to the use of narcotics], whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there," 370 U.S. at 666, Los Angeles through its ordinance does not purport to say that "a person can be continuously guilty of this offense," whether or not he has ever slept on a City street. This is important for two reasons: first, because it shows that the statute itself does not suffer the *Robinson* defect of making the status of being homeless a criminal offense; and second, because there is no evidence that Jones or any of the parties joining with him — including Purrie or Barger, who were convicted of violating LAMC § 41.18(d) — were unable to stay off the sidewalk on the night they were arrested. For this reason, Jones cannot prevail on the evidence presented even if it were open to us to rely on Justice White's concurring opinion in *Powell*, which I believe *Alaya* forecloses. Justice White ended up concurring in the result because Powell "made no showing that he was unable to stay off the streets on the night in question." *Powell*, 392 U.S. at 554 (White, J., concurring in the result). Despite this, the majority here reasons that unlike Powell, Purrie and Barger made a substantial showing that they are "unable to stay off the streets on the night[s] in question," because "[w]hether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human. It is undisputed that, for homeless individuals in Skid Row who have no access to private spaces, these acts can only be done in public." Maj. op. at 4450. This, of course, is simply a conclusion about the usual condition of homeless individuals in general. As Justice White pointed out with respect to Powell, "testimony about his usual condition when drunk is no substitute for evidence about his condition at the time of his arrest." *Powell*, 392 U.S. at 553 (White, J., concurring in the result). The same is true here. Testimony about Jones's usual condition when homeless is not a surrogate for evidence about his condition at the time he was arrested.

Wholly apart from whatever substantive limits the Eighth Amendment may impose on what can be made criminal and punished as such, the Cruel and Unusual Punishment Clause places no limits on the state's ability to *arrest*. Jones relies heavily on "mass arrests" of homeless people on Skid Row. However, the Eighth Amendment's "protections d[o] not attach until after conviction and sentence." *Graham*, 490 U.S. at 392 n.6. The Court said so in *Ingraham*: "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions," 430 U.S. at 671 n.40, and reiterated this position in *Graham*, 490 U.S. at 392 n.6. *See also John- son*, 61 F.3d at 445 (finding that plaintiffs who had not been convicted of violating a sleeping in public ordinance lacked standing to challenge it on Eighth Amendment grounds). It is not open to us to back off the rule, or to accept, as the major- ity here does instead, the view of the *dissent* in *Ingraham* that the Court's rationale was based upon the "distinction between criminal and noncriminal punishment." Maj. op. at 4435 (quoting 430 U.S. at 687 (White, J., dissenting)).

In any event, there is a difference between the protection afforded by the Eighth Amendment, and protection afforded by the Fourteenth. Protection against deprivations of life, lib- erty and property without due process is, of course, the role of the Fourteenth Amendment, not the Eighth. The majority's analysis of the substantive component of the Eighth Amend- ment blurs the two. However, the *Eighth Amendment* does not afford due process protection when a *Fourteenth Amendment* claim proves unavailing. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees."); *id.* at 579 (Ste- vens, J., dissenting) ("Nor is this an Eighth Amendment Case. That provision . . . protects individuals convicted of crimes from punishment that is cruel and unusual. The pretrial detainees . . . are innocent men and women who have been

convicted of no crimes."). As Justice White's concurrence in *Powell* explains:

> I do not question the power of the State to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regained his powers. The person's own safety and the public interest require this much. A statute such as the one challenged in this case is constitutional insofar as it authorizes a police officer to arrest any seriously intoxicated person when he is encountered in a public place. Whether such a person may be charged and convicted for violating the statute will depend upon whether he is entitled to the protection of the Eighth Amendment.

*Powell*, 392 U.S. at 554 n.5 (White, J., concurring in the result). Thus the arrests upon which Jones relies do not implicate the *Eighth* Amendment.

Not only has Jones produced no evidence of present or past Eighth Amendment violations, he has failed to show any likelihood of future violations.[5] Since 1998, California has recognized a necessity-due-to-homelessness defense to ordinances such as LAMC § 41.18(d). *See Eichorn*, 69 Cal. App. 4th at 389-91. The defense encompasses the very difficulties that Jones posits here: sleeping on the streets because alternatives were inadequate and economic forces were primarily to blame for his predicament. *Id.* at 390. Jones argues that he and other homeless people are not willing or able to pursue such a defense because the costs of pleading guilty are so low and the risks and challenges of pleading innocent are substantial. But a constitutional violation cannot turn on refusal to employ a defense that prevents conviction. Moreover, defendants who

---

[5]This, too, calls into question the plaintiffs' standing. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139-41 (9th Cir. 2000) (en banc).

*do* plead guilty cannot suffer Eighth Amendment harm, because the guilty plea "is an admission of each and every element required to establish the offense" and thus "constitutes an admission . . . [of] the requisite culpable intent" — that is, the voluntary *choice* to sleep on the street and the absence of an unavoidable compulsion to do so. *See Kidder*, 869 F.2d at 1332-33.

As the Eighth Amendment does not forbid *arrests*, the injunction sought by Jones extends beyond what would be necessary to provide complete relief even if *convictions* under the ordinance were unconstitutional. An injunction "should be no more burdensome to the defendant than [is] necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Here, there is no evidence of *Eighth Amendment* harm to any of the six homeless persons who prosecute this action and equitable relief cannot be based on alleged injuries to others. *Hodgers-Durgin v. de La Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc). Therefore, the record does not support the relief sought, even under Justice White's concurrence in *Powell*. Regardless, as a matter of constitutional law, the Eighth Amendment could at most entitle Jones to an injunction forbidding *punishment* of a homeless person under the ordinance when he demonstrates a necessity defense; however, I would decline to accord any such relief as it would entail "intrusive and unworkable" federal oversight of state court proceedings. As the Supreme Court explained in *O'Shea v. Littleton*, 414 U.S. 488 (1974), such an injunction would not "strike down a single state statute, either on its face or as applied[, nor] enjoin any criminal prosecutions that might be brought under a challenged criminal law," but rather would be "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 500. This would run afoul of *Younger v. Harris*, 401 U.S. 37 (1971), and related cases. So, too, would an injunction requiring state courts to permit and to apply the *Eichorn* defense. The proper procedure for homeless people to protect their rights would be

to plead "not guilty and then to challenge the constitutionality" of their conviction, either through direct appeal or collateral review, in the event their necessity defense was rejected by the court. *See Kidder*, 869 F.2d at 1333.

As the majority's opinion seems to me contrary to the Supreme Court's instruction to apply *Robinson* sparingly, and instead applies it expansively, I dissent. I believe the district court correctly concluded that the substantive limits on what can be made criminal and punished as such do not extend to an ordinance that prohibits the acts of sleeping, sitting or lying on City streets. Accordingly, I would affirm.